AUGUSTA C. GENET, Appellant and Respondent, v. THE PRESIDENT, MANAGERS AND COMPANY OF THE DELAWARE AND HUDSON CANAL COMPANY, Appellant and Respondent.

122  505
128  509,
122  505
136  602
122  505
149  173

122   505
s163  175

122   505
s170  1279
s170  284
s170  290
s170  292
s170  293

In 1864 the parties herein entered into a contract which stated in substance that plaintiff and her husband, as parties of the first part, for certain considerations specified "hath leased and doth hereby lease" to defendant "all the coal contained in or under" certain lands in the state of Pennsylvania, described in the contract, which belonged to plaintiff, "in any event to include all the coal that can be economically mined or taken out from the above-described premises." In an action based upon the contract, held, that the legal effect of the instrument was to vest in the defendant an estate in fee in the coal as a separate piece of land.

The agreement also granted to defendant "the right to enter upon and into said lands, and to dig and mine and remove said coal through or out of any shafts, slopes or tunnels they (defendant) may dig, erect or construct upon the premises." Also, "the right of way for all  *  *  * slopes, tunnels,  *  *  * ditches and drains that they may find necessary to construct across or upon said track, with the right to erect drains upon the surface for the proper mining of said coal; also, the use of land for digging all the air shafts they may consider necessary,  *  *  * together with land for piling coal or culm, and all other appurtenances they may require for mining, receiving, removing, cleaning,  *  *  * preparing and forwarding the coal to be mined under this agreement." Defendant agreed to mine not less than 10,000 tons for the years 1865 and 1866, and to pay therefor whether the same was mined or not, and to mine 20,000 tons in each and every year thereafter. In case the specified quantity was not mined in any year, but was paid for, defendant had the privilege "of taking out without charge, at any time thereafter, a quantity of coal equal in amount to the deficiency" in the preceding years. The contract also provided that defendant might mine more than the quantity specified in any year, and at its option diminish the quantity for any succeeding year to an amount corresponding with the increase. It was also agreed that defendant might use and occupy the rights and privileges granted, and the openings, fixtures and appurtenances made and constructed by it "for the mining, preparing and forwarding coal under this contract, for the mining, preparing and forwarding coal from any adjoining or contiguous lands until all the lands that they desired to take coal from and that can be mined and taken out through said openings, shafts and slopes shall be exhausted." Defendant constructed upon the land a shaft, breakers, etc., much larger than was necessary for the purpose of mining the minimum quantity of coal specified in the contract. While mining more than those quantities from the plain-

tiff's land it used the said structures for the mining of much larger quantities of coal from adjoining lands. *Held,* that defendant acquired a present, absolute, distinct and independent right to the use of said structures for the mining of coal on the adjoining lands; that the only obligation that rested upon it as to the quantity of coal to be mined from plaintiff's land was to mine the quantity specified each year, and while it fulfilled that obligation its right to take coal from adjoining property could not be interfered with; that such right did not depend upon any condition as to exhausting the coal from plaintiff's land, or its producing quantity in any one year, and could not be subordinated to the mining on plaintiff's property.

Also *held,* that defendant had the right to pile upon plaintiff's land the culm or refuse coal taken from the adjoining lands.

For the purpose of furnishing a second opening, as required by a Pennsylvania statute prohibiting the working of any coal mine unless there are at least two shafts or outlets, defendant, after it had sunk the shaft upon plaintiff's lands, drove a heading or gangway through to another shaft on adjoining property, and upon discovering that the opening thus made could be utilized for the purpose, constructed and finished said heading so that it could be used as a drain, conducting the waters from two other mines to the shaft on plaintiff's land, and large quantities of water from adjoining property were conveyed through the heading to said shaft on plaintiff's land, and were pumped up and discharged through it, pumps of a sufficient capacity having been placed therein for that purpose by the defendant. *Held,* that a judgment requiring the defendant to close up said heading, so far at least as to prevent the water from the adjoining property from flowing upon plaintiff's property was error; that the contract gave to defendant the right to so drain the water from the adjoining mines to the shaft on plaintiff's land; also, that it was a proper and sufficient compliance with said statute to thus afford a second opening by connecting the two shafts; that defendant had the right to unite its workings on all the properties into one mine.

To sustain an injunction, injury material and actual, not fanciful, theoretical or merely possible, must be shown as the necessary or probable result of the action sought to be restrained.

Reported below, 24 J. & S. 27.

(Argued October 21, 1890; decided December 2, 1890.)

Cross-appeals from a judgment of the General Term of the Superior Court of the city of New York, entered upon an order made May 10, 1888, which modified, and as modified affirmed, a judgment entered upon the report of a referee.

On the 28th day of March, 1864, the parties to this action

entered into an agreement, the parts of which material to this controversy are as follows:

"Memorandum of agreement made and concluded this twenty-eight day of March, A. D. one thousand eight hundred and sixty-four (1864) between George C. Genet and Augusta G. Genet, his wife, of the city, county and State of New York, of the first part, and the President, Managers and Company of the Delaware and Hudson Canal Company, of the second part, witnesseth: That the said parties of first part, for themselves, their heirs, executors, administrators and assigns, as well as for and in consideration of the covenants and agreements hereinafter mentioned, to be kept and performed by and on the part of the said party of the second part, as for and in consideration of the sum of one dollar to each of them in hand paid by the said party of the second part, the receipt whereof is hereby acknowledged, hath leased and doth hereby lease unto the said, the President, Managers and Company of the Delaware and Hudson Canal Company, their successors and assigns, all the coal contained in, on or under that certain piece or parcel of land situate, lying and being in the borough and township of Providence, county of Luzerne, and State of Pennsylvania, described as follows to wit:    *  *  *

"Said coal supposed to be contained in the veins known and designated as the Diamond, Fourteen Foot and Clark veins, but in any event to include all the coal that can be economically mined or taken out from the above-described premises, together with the right to enter upon and into the said lands, and to dig and mine and remove said coal through or out of any shafts, slopes or tunnels they may dig, erect or construct upon the premises, and said parties of the first part further hereby lease and grant to said party of the second part, their successors and assigns, without charge, the right of way for all railroads, turnouts, switches, slopes, tunnels, mine roads, wagon roads, ditches and drains they may find it necessary to construct across or upon said tract, with the right to erect drains upon the surface for the proper mining of said coal, also the use of land for digging all air-shafts that they

may consider necessary, with the right to dig the same, and also the use of all the land they may require for the purpose of erecting repair-shops, or any other shops or buildings they may deem necessary for the prosecution of their business, together with lands for piling coal or culm, and all other appurtenances they may require for mining, receiving, removing, cleaning, screening, dumping, storing, preparing and forwarding the coal to be mined under this agreement * * *.

"And the said party of the second part, their successors and assigns, doth hereby promise and agree to mine from said land in the year one thousand eight hundred and sixty-four, not less than ten thousand tons of coal, in the year one thousand eight hundred and sixty-five, not less than ten thousand tons, and twenty thousands tons in each and every year thereafter. It being understood that the said party of the second part is to pay for ten thousand tons in each and every year, whether the same shall be actually taken out in such year or not, and that in case the maximum quantity of twenty thousand tons in 1866 is not taken out, or any subsequent year, interest at the rate of seven per centum per annum shall be paid by the said party of the second part to the said parties of the first part, their heirs or assigns, upon such sums as the deficiency shall amount to, said interest to be continued until the full quantity agreed to be taken out as aforesaid shall be reached. Provided, that the said party of the second part shall not have been relieved from liability to mine said coal in whole or in part, as is hereinafter mentioned ; and, provided further, that the said party of the second part shall have the privilege of taking out without charge, at any time thereafter, a quantity of coal equal in amount to the deficiency they may have paid for in any previous year or years * * *.

"And the said party of the second part agrees to pay for the coal mined and taken out in pursuance of this agreement at the rate of twelve and one-half cents (12½), for every ton of (2,240) twenty-two hundred and forty pounds of clean merchantable coal, exclusive of culm or mine waste that will pass through a mesh one-half inch square ; payments to be

made monthly, in cash, for coal mined during the preceding month, to the said parties of the first part, their heirs and assigns at the pay office of the party of the second part ·* * *.

" And it is further understood and agreed that if the said party of the second part elect to do so they may increase the quantity beyond that stipulated to be mined in any one year, and at their option may diminish the quantity for any succeeding year or years by an amount corresponding with such increase; provided that the quantity mined shall not be less in the aggregate than is hereinbefore stipulated. * * *

" And it is further agreed and understood that the party of the second part, their successors and assigns, may use and occupy the rights and privileges hereby granted, and the openings, buildings, fixtures and appurtenances made and constructed by them for the mining, preparing and forwarding coal under this agreement, for the mining, preparing and forwarding coal from any adjoining or contiguous lands until all the lands that they desire to take coal from and that can be mined and taken out through said openings, shafts and slopes, shall be exhausted. That the party of the second part, their successors and assigns, shall have the right to rebuild, reconstruct or remove any or all of the buildings, fixtures, machinery, appurtenances and improvements during the continuance of this agreement and until the coal in the adjoining and contiguous lands that can be worked from their openings, shafts, slopes, and tunnels, shall have been worked out. The removing of buildings, fixtures and appurtenances to be made within a reasonable time after the lands shall have been exhausted."

The complaint, based upon this agreement, set forth two causes of action:

1. To recover damages for breach of the contract in failing to mine from the land described therein as much coal as could be mined therefrom with capital and industry.

2. For an injunction restraining the defendant from using the plaintiff's land and the works erected thereon to mine coal from adjoining and contiguous lands until all the plaintiff's coal

had been mined, and from using the tunnels in and through the coal for the purpose of drawing water from said adjoining lands onto the plaintiff's lands, and requiring them to close up said tunnels, except so far as they were necessary to mine coal from plaintiff's land.

The referee who tried the case found the following among other facts:

" The coal contained within the land described in said instrument consisted of four principal seams or veins, commonly known as the 'Surface' vein, the 'Diamond' vein, the 'Fourteen foot' vein and the 'Clark' vein, which are situated with reference to the surface and each other in the order above stated. In addition to these principal veins, there are several other intermediate veins of less thickness, which have not been worked upon the property in question, or in the township wherein plaintiff's said land is situated."

" In 1871, defendant began to sink a shaft, known as the 'Marvin Shaft,' upon the land in question for the purpose of mining the different seams of coal, other than the 'Surface Vein,' contained in said land. Said shaft is located near the Lackawanna river, which forms the southeasterly boundary of the lands in question and which separates said lands from a tract of land owned by the defendant, containing about 500 acres, which is known as the 'Farm;' said shaft was sunk to the depth of about 450 feet passing through all of said veins of coal and was completed prior to May, 1875."

" In 1875, defendant began the erection of a building upon the lands in question known as a coal breaker, which was completed in 1876; various other buildings were also erected by defendant upon the lands in question during the years 1876 and 1877; and prior to 1878 all the buildings and other improvements made by defendant upon the said lands were completed substantially as they now are. The capacity of the shaft and breaker is sufficient for the mining and preparing for market of two hundred thousand tons of coal per annum."

" In 1870, a statute was passed by the legislature of the state of Pennsylvania, wherein said lands are situated, which is now

in force and which prohibits the working of any coal mine or colliery unless there are in communication with each seam of coal worked in said mine at least two shafts or outlets, 150 or more feet apart, through which ingress and egress may be had by the persons employed in said mines ; said statute, however, does not require both of said shafts or outlets to form part of the same mine or colliery, but permits connection to be made with another mine or colliery for the purpose of such second opening, provided such connection can be made through coal."

"At the time of the execution of the instrument above referred to and at the time the said 'Marvin Shaft' was begun, defendant was the owner, or lawfully entitled to the possession of, a coal mine or colliery known as the 'Leggett's Creek Shaft' and distant from the 'Marvin Shaft' in a southwesterly direction about 3,700 feet, and also of another coal mine or colliery lying south of and adjoining the 'Leggett's Creek Shaft,' known as the 'Van Storch Shaft.' In 1864, defendant acquired the right to mine the coal from a part of the land lying between the lands in question and 'Leggett's Creek Shaft,' and in 1873 it acquired the right to mine the coal from the balance of the intervening lands, so that when the 'Marvin Shaft' was completed, in 1875, defendant had the right to mine all the coal lying between the said shaft and the 'Leggett's Creek Shaft,' except as to so much thereof as was necessary for the support of the surface."

"In or prior to 1875, and in the ordinary course of mining at the 'Leggett's Creek Shaft,' a heading or gang-way had been driven through the coal in the 'Fourteen foot vein' in the direction of the 'Marvin Shaft' for a distance of about 500 feet. On the completion of the said shaft, a heading or gang-way through the coal in said 'Fourteen foot vein' was started by defendant from the 'Marvin Shaft' and driven towards 'Leggett's Creek Shaft' to meet a similar heading driven from 'Leggett's Creek Shaft' towards the 'Marvin Shaft,' the object of such heading being at first to furnish the second opening for the 'Marvin Shaft,' required by the law of Pennsylvania as hereinbefore stated. After connection was made between

the two headings defendant having discovered that the opening thus made between the two mines could be utilized for the purpose of drawing the water from the 'Leggett's Creek' and 'Van Storch' veins, constructed and finished the said heading or gang-way so that it constituted a drain conducting the water from said mines to and upon plaintiff's lands and to the shaft or opening made thereon as aforesaid. Connection was made between the two headings in 1875. The opening or passage-way thus made between the two shafts is about fifteen feet wide and is of a height equal to the thickness of such vein — the whole vein being cut through."

"After the completion of the 'Marvin Shaft' the defendant made another heading or gang-way running therefrom through the 'Fourteen foot vein' to and upon the land of defendant known as the 'Farm' for the purpose of mining the coal thereon through the 'Marvin Shaft' which heading is also so constructed that the water from that portion of the mine upon defendant's land will run therefrom to the 'Marvin Shaft.'"

" The formation of the coal deposits upon plaintiff's land and the lands adjoining and surrounding the same is such that each of the seams of coal contained therein dips downward toward the 'Marvin Shaft,' so that each vein of coal at the point where it intersects the said shaft lies at a lower level than the same vein on the adjoining and adjacent lands. In consequence of such formation and of the construction of such headings or gang-ways leading from the 'Marvin Shaft' to defendant's adjoining properties large quantities of water which flow into the cuttings made in the course of mining are conveyed through said headings from the 'Leggett's Creek Shaft,' the 'Van Storch Shaft' and the 'Farm' to and upon plaintiff's land and to the 'Marvin Shaft.'"

" For the purpose of removing the water so running to the 'Marvin Shaft,' as well as the water running thereto from the cuttings made in the course of mining on the plaintiff's land, defendant placed in said shaft pumps of large capacity, to wit: one pump which pumps from 1,500,000 to 2,000,000 of

gallons of water every twenty-four hours which is run continuously, night and day; two other pumps which run at night and pump from three-quarters of a million to a million of gallons in twenty-four hours. In order to keep the 'Marvin Shaft' clear from water, it is necessary to operate said pumps to about the extent above specified, and in case they should for any reason cease to operate, the mine upon plaintiff's property would soon become flooded. The capacity of said pumping apparatus, however, is more than sufficient to raise all the water ordinarily flowing to the 'Marvin Shaft.'"

"The mine upon plaintiff's land is what is termed a dry mine, producing comparatively little water, and the great bulk of the water so pumped at the 'Marvin Shaft' flows thereto through said headings from defendant's adjoining properties."

"The water pumped from said shaft as aforesaid is conveyed through an underground channel which comes to the surface between high and low-water mark upon the bank of the Lackawanna river and is discharged into said river."

"The 'Leggett's Creek Shaft' and 'Van Storch,' are each equipped with pumping apparatus of sufficient capacity to pump the water ordinarily collecting in the workings around those shafts, but when the entire amount of water collecting in all the workings which are connected with the 'Marvin Shaft' does not exceed the capacity of the pumps at that shaft, the water from all the shafts and workings is allowed to run down to that shaft, and the pumps in the 'Leggett's Creek Shaft,' and the 'Van Storch Shaft' are only used when there is an extra quantity of water, more than the capacity of the pumps at the 'Marvin Shaft' will enable them to remove."

"From the developments thus far made the quantity of coal in plaintiff's land at the time mining was first commenced thereon, may fairly be estimated at from three to four millions of tons, and the colliery, if the mining should be limited to plaintiff's land, is capable of producing from eighty thousand to one hundred thousand tons of coal each year. Such a

colliery would reasonably and ordinarily require for the purposes of shaft, breaker, necessary out-buildings and other improvements, and for the deposit of all the culm produced from the quantity of coal supposed to be contained in said land, from twenty to twenty-five acres of surface land. Defendant has taken and is now occupying for its various structures and improvements heretofore stated, including the land thus far taken for the deposit of culm, about sixteen and one-half acres of land."

"All of the culm or waste coal from the coal mined through the ' Marvin Shaft ' has been deposited upon plaintiff's land, and the land thus far taken by defendant for that purpose is seven acres, seventeen perches, upon which land the culm is now piled up to the average height of from forty to fifty feet. The effect of such a deposit is to render the surface land valueless for any other purpose. If only the culm from the coal mined from plaintiff's land had been deposited thereon not more than three and one-half acres would, up to the present time, have been required for such deposit. The ' Marvin Shaft ' is so located that it is practicable by constructing a bridge over the Lackawanna river to remove the culm coming from the coal mined by defendant on its own land, and to deposit the same upon the land known as the ' Farm,' on the opposite side of said river. Such a place of deposit would be no further distant from the shaft than the place of deposit of the culm from the coal mined from the ' Van Storch Shaft ' is from that shaft, and it would not interfere with the convenient and economical working of the ' Marvin Shaft' to require the culm arising from the coal mined through that shaft from defendant's land to be thus deposited upon the surface of the ' Farm.' If the whole of the culm from defendant's lands which are now being mined through the ' Marvin Shaft,' together with that arising from the coal mined upon plaintiff's land shall be thrown upon the plaintiff's land it will cover the whole surface to at least the depth of the deposit of culm now made thereon and will necessitate the occupation of a much greater part of the surface than is

or will be required for the deposit of the culm which has been or can be mined from defendant's land."

" Defendant, instead of using the ' Marvin Shaft ' and breaker, and other structures, improvements and the headings or gang-ways connected with said shaft, primarily, or in a reasonable degree, for the mining of the coal on plaintiff's land, used and is now using the same principally for the mining of coal from its own lands, and for the benefit of its other collieries."

" Plaintiff has never assented to the use of the ' Marvin Shaft ' and breaker, and the various structures and improvements connected therewith in any way that would interfere with or prevent the working of the colliery upon her own land to its full capacity, or to the use of the headings or gang-ways connecting the ' Marvin Shaft ' with defendant's other collieries for the purpose of draining the water from those collieries, or to the piling of the culm arising from the coal mined by defendant from other lands upon the surface of her land."

" It was practicable for the defendant to, and it could have sunk another shaft or opening upon the plaintiff's land for the purpose of complying with said Pennsylvania statute."

" Defendant has paid to plaintiff in full the royalties accruing to her as provided by said instrument, Exhibit 'A,'· upon the coal which its statements rendered to plaintiff show it has mined from her lands, which royalties have been received and retained by her."

The first cause of action was dismissed at the trial, but upon the second judgment was substantially as prayed for in the complaint, and defendant was enjoined,

1. From using the shaft sunk upon plaintiff's land, and the breaker, machinery and structures erected thereon for the purpose of mining and preparing for market coal from any adjoining and contiguous lands until all the coal which it was authorized to mine from plaintiff's lands under the agreement aforesaid had been taken out and prepared for market;

2. From depositing culm from coal mined from adjoining lands upon the surface of plaintiff's lands.

And plaintiff was awarded the sum of $3,000 damages sustained from the piling of culm on the property prior to the commencement of the action.

It was further required to close up the gang-ways made by it connecting the shaft in plaintiff's land (called the Marvin shaft) with shafts on adjoining lands called Leggett's creek shaft and Van Storch's shaft, and also with other adjoining lands of defendant called the "farm," so far as to prevent water from said two last-mentioned shafts and from the farm running therefrom to and upon plaintiff's lands.

Both parties appealed to the General Term, and that court modified the judgment by providing in substance that the defendant might use the shaft and machinery erected on plaintiff's land to mine coal from adjoining lands when said shaft and machinery should be used to its full capacity to mine plaintiff's coal, and, as so modified, affirmed the judgment upon the appeal of both parties.

Further facts appear in the opinion.

*Geo. C. Genet* for plaintiff. The agreement itself is a contract and not a conveyance of the coal to defendant in fee as is claimed by it, reserving nothing to plaintiff but an annuity or minimum rent of $2,500 a year, with an obligation on her part to pay the yearly taxes which might soon exceed the annuity. It is a license to mine and remove the coal, and is not unilateral. It is a contract on its part to mine the coal, and it expressly binds itself to exhaust the land of the coal and remove its machinery within a reasonable time thereafter, and restore the land occupied by it to plaintiff; this obliges it to work with reasonable industry. (*White* v. *Hoyt*, 73 N. Y. 511; *Hoffman* v. *E. Ins. Co.*, 32 id. 405; *Johnson* v. *Hathorne*, 2 Abb. Ct. App. Dec. 409; *Restwick* v. *O. C. Co.*, 129 Penn. St. 592; *Booth* v. *C. Mills*, 74 N. Y. 23, 25.) As to the quantity beyond the minimum it was left to the general rule requiring the defendant to mine it with reasonable industry, or it was the subject of a parol contract as collateral for which the delivery of the lease was a consideration, and

its agreement in respect to it was a good collateral obligation. (*Restwick* v. *O. C. Co.*, 129 Penn. St. 592; *Clifford* v. *Watts*, L. R. [5 C. P. Div.] 577; *Bute* v. *Thompson*, 13 M. & W. 487; *Rex* v. *Budworth*, 8 East, 387; *Jervis* v. *Thompson*, 1 H. & N. 195; *McIntyre* v. *M. C. Co.*, 105 N. Y. 266.) The parol evidence related to a future contingency, and was, therefore, admissible. (*Schnittler* v. *Simon*, 114 N. Y. 184; *Gunson* v. *Mason*, 60 id. 394; *Juillard* v. *Chaffee*, 92 id. 529; *Chapin* v. *Dobson*, 78 id. 74; *Schroeder* v. *Frey*, 114 id. 268; *Blossom* v. *Griffin*, 13 id. 569; *Springstein* v. *Samson*, 32 id. 703; *Calhenes* v. *Falk*, 39 Barb. 620; *Field* v. *Munson*, 47 N. Y. 221; *Denton* v. *Peters*, L. R. [5 Q. B.] 474; *Filkins* v. *Whyland*, 24 id. 338; *Eighmie* v. *Taylor*, 98 id. 294; *Morgan* v. *Griffith*, L. R. [6 Ex.] 70; *Lindley* v. *Lancey*, 17 C. B. [N. S.] 578; *Jarvis* v. *Berridge*, L. R. [8 Ch. Div.] 351; *Hope* v. *Balm*, 58 N. Y. 381; *Lewis* v. *Seabury*, 74 id. 413; *Manchester* v. *Bradner*, 107 id. 189; 1 Smith's L. C. 960; 2 Pars. on Cont. 147.) Since the portions relating to the minimum do not embrace the whole subject of the agreement, as to the surplus the agreement is a statement of one side of the contract, and parol evidence is admissible to show its agreement as to the other part. (*Eighmie* v. *Taylor*, 98 N. Y. 294; *Wilkins* v. *Whyland*, 24 id. 338.) An option or right to elect is not a contract, but is unilateral because it binds one party to make a contract and leaves the other free to make it or not. Therefore, the plaintiff's demand as to how the option would be exercised by them did not contradict the writing. (*Mansfield* v. *N. Y. C. & H. R. R. R. Co.*, 14 N. Y. 331; *Miller* v. *McKenzie*, 95 id. 575; *Russell* v. *Allerton*, 108 id. 292.) Plaintiff's agent finding the contract which was drawn by defendant somewhat obscure as to its meaning, went to defendant, and before he would deliver it asked if it was such a contract as it had promised to give, one that would require it to prove the coal, and if it proved, to mine it with all possible industry, and defendant replied in the affirmative and promised again to make it as profitable to plaintiff as industry and capital could make it,

and it would proceed at once; the defendant is estopped from denying such to be the true construction of the contract. (*Riggs* v. *Palmer*, 115 N. Y. 506; *Remington* v. *Palmer* 62 id. 32; *Stockwell* v. *Holmes*, 33 id. 53; *Van Buskirk* v. *Roberts*, 31 id. 661; *Murdock* v. *Gilchriss*, 52 id. 247; *Murray* v. *Smith*, 1 Duer, 427; 12 Wend. 446; *Dunn* v. *Steubling*, 120 N. Y. 237; *Wendell* v. *Van Rensselaer*, 1 Johns. Ch. 344; *Storrs* v. *Barber*, 6 id. 166; *Town* v. *Needham*, 3 Paige, 545; *Dalzell* v. *Odell*, 3 Hill, 215; *Brown* v. *Sprague*, 5 Den. 545; *Plumb* v. *C. Co.*, 18 N. Y. 393; *W. Canal* v. *Hathaway*, 8 Wend. 483; *Thompson* v. *Blanchard*, 4 N. Y. 303; *C. N. Bank* v. *N. Bank*, 50 id. 575; *Armour* v. *M. C. R. Co.*, 65 id. 111; *N. Y. R. Co.* v. *Rothery*, 107 id. 316; *M. Bank* v. *Hazard*, 30 id. 226; *Place* v. *Hayward*, 117 id. 492.)

*Matthew Hale* and *Frank E. Smith* for defendant. The parol evidence offered by plaintiff was properly excluded. (*Wilson* v. *Dean*, 74 N. Y. 531, 537; *Eighmie* v. *Taylor*, 98 id. 288; *Marsh* v. *McNair*, 99 id. 175; *Corse* v. *Peck*, 102 id. 513; *Long* v. *M. I. Co.*, 101 id. 638; *Gordon* v. *Nieman*, 118 id. 152; *Routledge* v. *W. Co.*, 119 id. 592; *Naumberg* v. *Young*, 44 N. J. L. 331; *Worrall* v. *Munn*, 5 N. Y. 229; *People* v. *Bostwick*, 32 id. 445; *Cocks* v. *Barker*, 49 id. 107; *Van Bokkelin* v. *Taylor*, 62 id. 195; *Ridgway* v. *Bowman*, 7 Cush. 268; *Bast* v. *Bank*, 101 U. S. 93; *Martins* v. *Berens*, 67 Penn. St. 459; Story on Confl. of Laws, §§ 634, 635; *Bain* v. *W. Co.*, 3 H. L. Cas. 1, 19; *Cheney* v. *Arnold*, 15 N. Y. 345, 353; *Monroe* v. *Douglas*, 5 id. 448; *Savage* v. *O'Neill*, 44 id. 298; *Rice* v. *Harbison*, 63 id. 493; *Chapin* v. *Dobson*, 78 id. 74, 79.) The parol contract set out in the first count of the complaint is void, under the Statute of Frauds, as a contract which by its terms is not to be performed within one year. (2 R. S. 135, § 2; *Dung* v. *Parker*, 52 N. Y. 494; *Broadwell* v. *Getman*, 2 Den. 87; *Kellogg* v. *Clark*, 23 Hun, 393; *Marcy* v. *Marcy*, 9 Allen, 8; *Frary* v. *Sterling*, 99 Mass. 461; *Baldwin* v. *Palmer*, 10 N. Y. 232; *Van Alstyne* v.

*Wemple*, 5 Cow. 164; *Harsha* v. *Reid*, 45 N. Y. 415; *Cagger* v. *Lansing*, 43 id. 550; *Levy* v. *Brush*, 45 id. 589; *Emery* v. *Smith*, 46 N. H. 151; *Pierce* v. *Paine*, 28 Vt. 34; *Bartlett* v. *Wheeler*, 44 Barb. 162.) The parol promises, sworn to by the plaintiff's witnesses, were not, if made, the promises of defendant. (Pierce on Railroads, 34; *Hoyt* v. *Thompson*, 5 N. Y. 320; *Risley* v. *I. B. & W. R. R. Co.*, 1 Hun, 202; *Olcott* v. *Tioga R. R. Co.*, 27 N. Y. 546; *F. Bank* v. *McKee*, 2 Penn. 318; *Hendrickson* v. *N. Y. & A. R. R. Co.*, 10 Wkly. Dig. 33.) No covenant can be implied into the lease to work the mine to its utmost capacity, or even to work it industriously. (*H. C. Co.* v. *P. C. Co.*, 8 Wall. 276; *Bruce* v. *F. N. Bank*, 79 N. Y. 154; *Wheatley* v. *W. B. C. Co.*, L. R. [9 Eq. Cas.] 538, 552.) Defendant is entitled to use the "Marvin Shaft" and its appurtenances for the purpose of mining coal from the adjoining lands. (MacSwinney on Mines, 238, 239; *Griffin* v. *F. P. Society*, 56 Barb. 114, 118.) Defendant is entitled at any time to connect the workings in the Genet property with its own workings in adjacent lands. (MacSwinney on Mines, 27; Bainbridge on Mines [4th ed], 28; *Caldwell* v. *Fulton*, 31 Penn. St. 475; *Caldwell* v. *Copeland*, 37 id. 427; *Armstrong* v. *Caldwell*, 53 id. 284, 287; *Clement* v. *Youngman*, 40 id. 341; *Kier* v. *Peterson*, 41 id. 357; *Scranton* v. *Phillips*, 94 id. 15; *Sanderson* v. *City of Scranton*, 105 id. 469; *D., L. & W. R. R. Co.* v. *Sanderson*, 109 id. 583; *Woodward* v. *D., L. & W. R. R. Co.*, 121 id. 344; *Eley's Estate*, 2 Kulp, 277; *Fairchild* v. *Fairchild*, 7 Cent. Rep. 873; *C. E. Co.* v. *Lucas*, 112 Mass. 424; *Massot* v. *Moses*, 3 S. C. [N. S.] 168.) Defendant is entitled to use the surface of plaintiff's land for the deposit of all the culm produced by its mining operations carried on at and through the "Marvin Shaft," whether such culm be the product of the Genet property or not. (Broom's Leg. Max. [6th Eng. ed.] 445; MacSwinney on Mines, 274; *Bushnell* v. *Proprietors*, etc., 31 Conn. 150; *C. R. Bridge* v. *W. Bridge*, 11 Pet. 420, 630; *Voorhees* v. *Burchard*, 55 N. Y. 98; *Sheets* v. *Selden*, 2 Wall. 177.) The court has not jurisdiction of the subject-

matter so as to enable it to award an injunction or damages under the second count of the complaint. (*Dand* v. *Kingscote*, 6 M. & W. 173; *Howard* v. *Banks*, 2 Burr. 1114; *Marker* v. *Kenrick*, 13 C. B. 187; *Watts* v. *Kinney*, 6 Hill, 82; *Cragin* v. *Lovell*, 88 N. Y. 258; *Dodge* v. *Colby*, 108 id. 445; *N. I. R. R. Co.* v. *M. C. R. R. Co.*, 15 How. [U. S.] 233; *People* v. *N. J. C. R. R. Co.*, 42 N. Y. 283; *A. & P. T. Co.* v. *B. & O. R. R. Co.*, 14 J. & S. 377; Pollock on Torts, 176; *A. U. T. Co.* v. *Middleton*, 80 N. Y. 408; *Doulson* v. *Matthews*, 4 T. R. 503; *Livingston* v. *Jefferson*, 1 Brock. 203; *Delafield* v. *Illinois*, 2 Hill, 159; *Cook* v. *Whipple*, 55 N. Y. 150; *Dudley* v. *Mayhew*, 3 id. 9.) Plaintiff has not made out a case which entitles her to equitable relief by way of injunction. (*Morgan* v. *City of Binghamton*, 102 N. Y. 500; *People* v. *C. Board*, 55 id. 390, 397; *T. & B. R. R. Co.* v. *B., H. T. & W. R. Co.*, 86 id. 107, 126; *Bassett* v. *S. M. Co.*, 47 N. H. 426, 438, 441; *P. R. R. Co.'s Appeal*, 125 Penn. St. 189; *Gt. W. R. R. Co.* v. *O. W. & W. R. R. Co.*, 3 DeG., M. & G. 341; *Harkinson's Appeal*, 78 Penn. 196; *Richard's Appeal*, 57 id. 105; *Wood* v. *Sutcliff*, 2 Sim. [N. S.] 163, 168; *Thorn* v. *Sweeney*, 12 Nev. 251.) The award of damages contained in the judgment is erroneous. (*Uline* v. *N. Y. C. & H. R. R. R. Co.*, 101 N. Y. 98; *S. M. Co.* v. *State*, 104 id. 562, 569.)

BROWN, J. The plaintiff sought to establish his first cause of action by proving a parol agreement made at the time of the execution of the written agreement, or prior thereto, and as a condition of its delivery. Upon well settled rules of evidence proof of such an agreement was properly excluded.

So much has been written by this court within recent years upon the rule which forbids the admission of oral evidence when offered to vary the terms of a written contract and the modifications and exceptions which exist as to that rule that the subject is about exhausted, and no further discussion is needed or desired. It is sufficient to say of the plaintiff's appeal, therefore, that this case does not fall within any of the

exceptions to the rule, and the judgment dismissing the complaint as to the first cause of action must be affirmed.

Upon the defendant's appeal we are to inquire into the propriety of the injunction that has been granted and the damages that have been awarded, and the first and most important question presented is whether the defendant, under the contract, acquired a present, absolute right to use the shaft, breaker and machinery and other structures erected upon the surface of plaintiff's land to mine and prepare for market coal from adjoining and contiguous property.

This right defendant has heretofore exercised, and has mined coal from plaintiff's property and from adjoining property through the Marvin shaft, the proof showing that from 1876 to May, 1886, 497,614 tons had been mined from plaintiff's property, and 608,771 tons from adjoining lands. This right has been denied to the defendant by the judgment awarded by the referee, and it has been granted conditionally by the General Term, but upon such terms as absolutely nullifies the right.

The solution of the question requires an examination of the contract to determine precisely the rights and obligations of the parties thereunder. It is necessary to understand clearly what it is that the defendant has acquired, and what obligations it has assumed.

The first thing acquired by the defendant was " all the coal contained in or under" the lands described in the contract, " together with the right to enter upon and into said lands, and to dig, mine and remove said coal."

It has the right to mine all the coal upon the land described in the contract, and this is without limitation as to time, except so far as that element may be controlled by the covenants and obligations thereto of the defendant, and it has the privilege to increase the quantity to be mined in any one year beyond the amount stipulated to be mined, *i. e.*, twenty thousand tons, and to diminish the quantity for any succeeding year or years by an amount corresponding with such increase.

Second. It acquired the right to dig and construct slopes, shafts and tunnels upon said premises, a right of way for rail-

roads, switches, terminals, mine-roads, wagon-roads, ditches and drains that it might be necessary to construct across and upon said tract; the right to erect drains upon the surface; the use of land for digging air shafts that might be considered necessary with the right to dig them; the use of land for repair shops, and any other shops or building deemed necessary for the prosecution of its business; the use of land for piling coal or culm, and all other appurtenances for mining, receiving, removing, cleaning, scouring, dumping, storing, preparing and forwarding the coal to be mined under the agreement.

Third. It acquired the right to use and occupy the rights and privileges granted, and the opening, buildings, fixtures and appurtenances made and constructed by it for mining, repairing and forwarding coal from the Genet property, for mining, preparing and forwarding coal from any adjoining or contiguous lands until the lands it should desire to take coal from, and that could be mined and taken out through said openings, shafts and slopes should be exhausted.

Also, to rebuild, reconstruct or remove any or all of the buildings, fixtures, machinery, appurtenances and improvements during the continuance of the agreement, and until the coal in the adjoining and contiguous lands that could be worked from said openings, shafts, slopes and tunnels should be worked out.

In consideration of the granting of the rights and privileges specified, the defendant agreed to mine from plaintiff's land in the years 1864 and 1865 not less than ten thousand tons of coal, and twenty thousand tons in each and every year thereafter.

To pay for ten thousand tons in each and every year whether the same was actually mined or not, and in case twenty thousand tons was not mined in 1866 or any subsequent year, interest at the rate of seven per cent per annum was to be paid to the plaintiff upon such sums as the deficiency should amount to; such interest to be continued until the full quantity agreed to be taken out was reached. And it was to have the

privilege of taking out at any time thereafter a quantity of coal equal in amount to the deficiency it may have paid for in any previous year or years. And for coal mined it agreed to pay at the rate of 12½ cents per gross ton.

The rights and privileges granted by this agreement to the defendant in the surface of the land so far as they applied to mining coal on plaintiff's land became as much its property as the coal beneath the surface. They were necessary for the prosecution of its business, and without them the value of the coal would have been materially decreased.

They were for immediate enjoyment, and the grant of them was for present use. Not only is that implied from the very nature and character of the transaction, but the language of the agreement is that of a present right. The language is "the parties of the first part hath leased and doth hereby lease, etc., etc., * * * the right to enter into said lands and to dig and remove said coal through or out of any shafts or tunnels they may dig or construct upon the premises, etc., etc., and the parties of the first part further lease and grant," rights of way and use of land, etc., "and all other appurtenances they may require for mining," etc., etc., "the coal to be mined under this agreement."

There is no doubt and no claim, but that all the privileges thus leased and granted passed into the immediate possession and enjoyment of the defendant upon the execution of the agreement. Turning now to the grant of the privilege of taking out coal from adjoining lands through the plaintiff's property the language is equally plain. It is "it is further agreed that the party of the second part * * * may use and enjoy the right and privileges hereby granted * * * for mining * * * coal under this agreement * * * for mining, preparing and forwarding coal from any adjoining or contiguous lands."

It is impossible to construe this language into a grant of a future enjoyment. There is no limitation or condition upon it. The words are apt and appropriate for a grant of present enjoyment, and there is nothing anywhere in the instrument

to indicate that these rights were to be used and occupied only when coal on plaintiff's land was exhausted.

The same rights which defendant acquired to mine coal from plaintiff's property it acquired to mine coal from adjoining property.

Again there is no reason for such a construction as the lower courts have given to the instrument.

The plaintiff's interest in the surface of the land requires that the privileges granted therein to the defendant should terminate as soon as possible, and such a result will be reached sooner by permitting mining from both properties to proceed together than to postpone one until the coal on the other is exhausted.

The construction adopted by the General Term may be a potent lever to compel defendant to mine and pay for coal on plaintiff's land much more rapidly than it has heretofore done or is now doing, but the judgment of the court cannot proceed upon such a reason, unless the obligation to do so is clearly imposed by the agreement of the parties, and that it is not imposed is too clear for argument and was so held by the referee in dismissing the first cause of action.

In language so plain that it admits of no doubt, the obligation to mine coal within any one year is limited to twenty·thousand tons, and even as to this amount it is contemplated that it may not always be done, and so it is provided that defendant when it mines less than that amount may pay interest upon the deficiency until it is made up in subsequent years. And in case it mines more than twenty thousand tons in any one year it may reduce the production by the amount of the excess in any subsequent year or years.

We are of the opinion, therefore, that the contract granted to defendant a present right to mine coal from adjoining lands by means of the shafts and machinery constructed upon the plaintiff's lands, and that the only obligation resting upon it as to the quantity of coal to be mined from plaintiff's land was to take out twenty thousand tons a year, and that while it fulfills this obligation according to the terms of the agreement, its

right to take coal from adjoining property by means of the Marvin shaft and machinery there erected cannot be interfered with. Such right does not depend upon any condition as to exhausting the coal from plaintiff's land or exhausting the producing capacity of that property in any one year, and it cannot be subordinated to the mining of coal on plaintiff's property.

It exists as a distinct and independent right, the use and enjoyment of which vested in the defendant upon the execution and delivery of the contract.

To hold otherwise would be to insert an entirely new stipulation into the contract, and instead of construing an agreement, the court would be making a new one.

As to the right to pile on the plaintiff's land culm or refuse coal taken from the adjoining property, which by the judgment the defendant is restrained from doing, and for which acts prior to the commencement of the action damages were awarded by the referee, there is but a single inquiry necessary, viz. : Is that one of the rights and privileges granted for the mining of the coal from plaintiff's land ? If it is, then it exists as to the coal mined from the adjoining property, for the agreement is that the same rights and privileges hereby granted for mining, preparing and forwarding coal under this agreement " may be used and occupied " for the mining, preparing and forwarding coal from any adjoining or contiguous lands.

Turning to the specification of the privileges granted for mining coal from plaintiff's land, we find this: "And the parties of the first part hereby lease and grant to the party of the second part the right of way for all railroads, etc., etc., together with lands for piling coal or culm."

The right existed, therefore, as to coal mined from plaintiff's land by express grant, and it follows from the plain language of the contract that it exists as to coal mined from adjoining and contiguous lands.

The part of the judgment remaining to be considered required and directed the defendant to close up the gang-way and gang-ways made by it connecting the Marvin shaft with

the Leggett's Creek shaft and the Van Storch·shaft, so far at least as would prevent the water from said two shafts from running therefrom to and upon plaintiff's land. Also to close up the headings or gang-ways leading from said Marvin shaft to defendant's lands, known as the "Farm," so far as to prevent the water from the workings on said farm flowing upon the plaintiff's land and to said Marvin shaft.

Under the construction we have given the contract between the parties the defendant has the right to mine coal from adjoining lands through the Marvin shaft, and this right necessarily implies a grant of means of access to those lands from plaintiff's lands. It follows, of course, that the defendant has the right to connect the headings and gang-ways on plaintiff's property with the workings about the Leggett's Creek shaft and upon the "Farm," and through them to bring to the Marvin shaft the coal mined upon those adjoining properties. The workings about the Van Storch shaft are connected with those about Leggett's creek and need not be particularly referred to.

The proof showed that there were at least fifty headings or openings through the coal which crossed the line between the plaintiff's and adjoining properties. And it is very plain that so far as the Leggett's creek workings were concerned the judgment in the respect now under consideration could not be executed without depriving defendant of its right to mine the coal from those workings through the Marvin shaft.

The plaintiff's land lies in a basin formed by it and surrounding property. The bottom of the basin is at the southeasterly side of the plaintiff's land, near the Lackawanna river, and the Marvin shaft was sunk at the lowest point, and the seams of coal all dip downward toward that point. The shaft intersects each vein of coal, and at the point of intersection each vein of coal is at a lower level than it is on the adjoining lands. So that as the headings are driven from the Marvin shaft the water naturally flows to that point.

The "fourteen-foot vein" from which the bulk of the coal has heretofore been mined, is nearly twelve feet lower at the

Marvin shaft than at the Leggett's Creek shaft, and it would be impossible, therefore, to close up the headings and gang-ways so far as to prevent the water from flowing through the same and still preserve the right to draw the coal from the workings about Leggett's Creek and Van Storch shafts to the Marvin shaft.

But we are of the opinion that the contract gives to the defendant the right to drain the water to the Marvin shaft.

The words of the contract under consideration which operate to convey the coal are, that the parties of the first part " doth hereby release unto the said " party of the second part " all the coal contained in, etc., etc., together with the right to enter upon said lands and dig, mine and remove said coal," and the legal effect of such conveyance was to vest in the defendant an estate in fee in the coal as a separate piece of land. (*Caldwell* v. *Fulton*, 31 Penn. St. 475; *Caldwell* v. *Copeland*, 37 id. 427; *Armstrong* v. *Caldwell*, 53 id. 284; *Sanderson* v. *City of Scranton*, 105 id. 469; *D., L. & W. R. R. Co.* v. *Sanderson*, 109 id. 583; *Fairchild* v. *Fairchild*, 7 Cent. Rep. 873.)

The defendant owned the coal in adjoining lands and the contract contemplated the mining of the coal on the whole property through a shaft or shafts to be constructed upon the plaintiff's land, and as I have shown, that the mining of coal from both properties should be carried on simultaneously.

The geological situation of the country, it is fair to assume, was known to both parties, and that in driving the gangways through the coal the water would naturally by force of gravity flow to the lowest point on plaintiff's land. The agreement also contemplated the necessity of the removal of the water, and we find provision made therefor in the following language: " The parties of the first part further hereby lease and grant to said party of the second part, its successors and assigns, without charge, the right of way for all tunnels, * * * ditches and drains they may find it necessary to construct across or upon said tract, with the right to erect drains upon the surface for the proper mining of said coal."

Bearing in mind that these rights and privileges may be "used and occupied" for mining coal from adjoining lands equally with the mining of coal from the plaintiff's land, and they appear to cover the question under consideration completely.

The right to drain upon the surface is distinguished from the right to construct drains and tunnels "across and upon said tract," and the latter expression is broad enough to embrace, and was intended to embrace, drains beneath the surface.

Bearing in mind also that the legal effect of the contract was to vest the title of the coal in the vein on plaintiff's land in defendant, and it becomes apparent that the right to construct drains and tunnels was not confined to the coal, but was intended to and did grant the right to go through the rock anywhere beneath the surface that the defendant should consider necessary.

It follows that, as defendant owned the coal, it could use the headings and gang-ways through the same for drains, if it so desired, and if the fact was, as the referee found, that the whole of the vein was cut through in the passage-way between the two shafts, and that the water flowed upon the surrounding rock and not in the coal, there was no trespass, for the reason that the defendant had a right to use the adjacent rock for such purpose.

The right to construct those drains, and to "use and occupy" them for the purpose of mining the coal from the adjacent lands also, of necessity implied the right to bring the water to the surface and get rid of it. The point where this would be done is left entirely to the defendant's judgment and plainly would be at the shaft, and the right to construct drains upon the surface was granted for that purpose.

The proof shows, and the referee found, that large pumps had been placed in the Marvin shaft of a capacity more than sufficient to remove all the water flowing to that point, and that it was discharged through an underground drain into the Lackawanna river, and none of it was discharged on the surface of the land.

We are thus brought to the final question in the case that it is necessary to consider; and that is, what injury has the plaintiff suffered from the defendant's acts in reference to the water? None of it reaches the surface of the land, and the whole substratum of rock is burdened with a servitude for ditches, drains and tunnels.

There is no finding of any injury, and no proof of any, so far as I am able to find. But from the opinion of the learned referee, it appears that the injury is one anticipated, rather than sustained.

It would not be fair or proper to call it a threatened injury, as that could not be said where the means employed to remove the water are more than adequate and had never failed.

But it is said that if the pumps should break down, or a strike occur, the pumping would stop and the mine be flooded.

Such remote possibilities, which properly belong to the category of accidents, are hardly sufficient to be made the basis of an application for the exercise of the great power of a court of equity.

"Injury, material and actual, not fanciful or theoretical or merely possible, must be shown as the necessary or probable result of the action sought to be restrained." (*People* v. *Canal Board*, 55 N. Y. 390–397.)

We are of the opinion, therefore, that in all that defendant did in reference to the water, it was within its strict legal rights, and that plaintiff has shown no injury.

This right of drainage was one that defendant was entitled to use for the purpose of mining its coal on the adjoining lands.

Assume its exercise must be limited to that which is necessary to mine the coal, there is no proof that any tunnels or underground channels had been constructed connecting the plaintiff's land with the adjoining property, except such as were constructed in the ordinary course of mining, and through the coal. The heading from the Marvin shaft to the Leggett Creek shaft was primarily built to afford a second opening for the mine, as required by a statute of Pennsylvania, passed in 1870.

It was proper to unite the two shafts for the purpose of complying with that law, and there is no force in the argument that the second opening should have been made on the plaintiff's land. The defendant had the right to unite its workings on all the properties into one mine, and there is no construction of the contract possible which would prevent it from so doing, or from utilizing the other shafts for additional openings to the Genet property.

It had also the right to mine the coal on any of their lands at any point most advantageous to itself, and so long as the manner of its working is not improper or unworkmanlike and does no injury to plaintiff's rights, and its obligations towards the plaintiff are fulfilled, there is no cause for complaint, and there can be no interference with defendant in its mining operations.

We are of the opinion that the evidence does not disclose any violation of plaintiff's rights by defendant, or that it has, in its mining operations, passed beyond the proper exercise and enjoyment of any of the privileges granted to it by the contract.

Testing this contract from the standpoint of the trial, many of its provisions appear to be burdensome to the plaintiff, but we cannot say that they were so at the time of its execution. It appears to have been fully understood and intelligently entered into, and the rights granted under it are vested and cannot now be disturbed.

Our opinion is that the judgment granted by the referee upon the second cause of action cannot be sustained, and as a new trial would be of no avail, it must be reversed and the complaint dismissed, while the judgment, from which the plaintiff appealed, is affirmed, with costs.

All concur.

Judgment accordingly.