## Lance, to use of Gummey et al., Appellant, *v.* Lehigh & Wilkes-Barre Coal Company.

*Mines and Mining—Coal lease—Culm—Breaker.*

A coal lease provided that the lessee should pay to the lessors twenty-five cents per ton of coal, " mined from the premises, that will pass over a five eighths of an inch mesh." The lease also provided that the lessor should " have all the culm or refuse coal from the mines." At the time the lease was made there was no general market for coal which would not pass over a five eighths mesh. Such coal went to the culm or refuse pile, but a belief existed that in the future means might be devised to utilize this coal. *Held,* that the lessor was entitled to only such culm or refuse coal as the lessee rejected and placed upon the refuse pile, and not to such pea and buckwheat coal as would pass through a mesh of five eighths of an inch and which the lessee chose to sell.

The lease provided that for the purpose of " making openings, erecting a breaker and necessary machinery, constructing railroads for sidings, and depositing culm, the said party of the second part shall have so much surface as may be necessary for breaking and operating and removing coal mined upon the premises." *Held,* that the lessee was not obliged to build his breaker upon the lands of the lessor, and that his failure to do so was not a violation of the covenants of the lease.

The lessee deposited culm from the lessor's mines on a refuse pile where he deposited culm from other mines. The evidence showed that it was customary to deposit on one pile culm mined from mines owned by different parties. It did not appear that the lessor had been prevented from taking culm from the heap where it had been deposited. *Held,* that there was no violation of the lease by the lessee.

Argued March 29, 1894. Appeal, No. 285, Jan. T., 1894, by William L. Lance, to use of Thomas A. Gummey and the Fidelity Ins. Trust & Safe Deposit Co., from order of C. P. No. 4, Phila. Co., June T., 1890, No. 4, dismissing exceptions to report of referee. Before GREEN, WILLIAMS, MCCOLLUM, MITCHELL and FELL, JJ. Affirmed.

Assumpsit on coal lease.

The master, S. S. Hollingsworth, Esq., reported as follows:

### " FINDINGS OF FACT.

" 1. On Oct. 21, 1871, William L. Lance leased to Thomas Broderick and others, by deed duly executed by all parties,

'all the anthracite coal upon and under' certain described parcels of land in Plymouth township, Luzerne county, in the state of Pennsylvania, 'with the right and privilege to enter upon and mine and remove the same.' This indenture of lease provided inter alia as follows:

"'2d. The parties of the second part, their executors, administrators and assigns, shall pay to the said party of the first part, his administrators and assigns, twenty-five cents per ton of two thousand two hundred and forty pounds of coal mined from the premises described, that will pass over a five eighths of an inch mesh. The rent or royalty shall be paid quarterly in each year of the term, on the first days of April, July, October and January, for all coal that may be mined up to those times respectively. But the said parties of the second part, whether coal be mined or not, shall pay annually, to the said party of the first part, a minimum rental of eight thousand dollars per year, payable on the first days of April, July, October and January aforesaid. But if the said parties of the second part shall fail in any one year to mine coal sufficient to amount to the said minimum, which they shall have paid, the deficiency may be made up in any subsequent year.'

"'8th. The parties of the second part shall not assign this lease nor underlet the premises, or any part thereof, without the written consent of the party of the first part.'

"'12th. The party of the first part shall have all the culm or refuse coal from the mines, and shall have the right and privilege to enter upon the premises at any time and remove the same, but the said parties of the second part may use so much of the culm as may be necessary for any purposes about their works.'

"2. The lessees immediately entered into possession under this lease.

"3. On April 1, 1872, Thomas Broderick, Thomas D. Conyngham and T. Frank Walter assigned all their rights, privileges, property, title and estate in the land, machinery, improvements and fixtures mentioned and demised in the said lease of Oct. 21, 1871, to the Lehigh Coal and Navigation Co., subject to the performance by the said Lehigh Coal and Navigation Co., its successors and assigns, of the covenants and agreements of the said Thomas Broderick, Thomas D. Conyngham and T.

Frank Walter in the said lease contained, and to the payment of the rent or royalty therein reserved and agreed to be paid after the first day of April, 1872.

" This assignment was under seal and executed by the assignors, but not by the assignee, the Lehigh Coal and Navigation Co., and does not appear to have received the written consent of William L. Lance, the original lessor.

" 4. The Lehigh Coal and Navigation Co. entered into possession of the demised premises under this assignment and mined coal for some time.

" 5. On March 28, 1874, the said Lehigh Coal and Navigation Co. assigned to the defendant, the Lehigh and Wilkes-Barre Coal Co., all its 'rights, privileges, property, title and estate into or unto the lands, machinery, improvements and fixtures mentioned and demised in said lease of Oct. 21, 1871, subject only to the performance by the said the Lehigh and Wilkes-Barre Coal Co., its successors and assigns, of the covenants and agreements of the said the Lehigh Coal and Navigation Co., for themselves and for Thomas Broderick, Thomas D. Conyngham and T. Frank Walter, in the said lease contained, and to the payment of rent or royalty therein reserved, from and after Jan. 1, 1874.

" This assignment was under seal and executed by both the assignor and assignee.

" 6. The assignee, the defendant in the present suit, entered into possession of the demised premises and has continued in possession ever since, except during the time the property was in possession of receivers appointed by the United States circuit court, as hereinafter mentioned.

" 7. The Lehigh and Wilkes-Barre Coal Co. were in the hands of receivers, appointed by the circuit court of the United States for the western district of Pennsylvania, from Feb. 12, 1877, until March 6, 1882. The accounts of the receivers were settled monthly before a master, appointed by the court, and a final decree entered showing that they had been so settled.

" 8. The customary way of preparing coal for shipment in the Wyoming region is to pass it over a breaker, and this was the custom in 1871.

" 9. [Mining several properties through one colliery is an ordinary method of mining.] [2]

" 10. The coal from the Lance property was mined by the defendant through two collieries, the Reynolds colliery and the Nottingham colliery, neither of which was situated on the lessor's property.

" 11. [Culm or refuse is the coal which passes through the screens of the breakers and is then placed on what is known as the culm or refuse heap.  It is unmarketable coal, and may, according to the demand of the market, include at one time what is marketable at another time.  The various sizes of coal which are prepared for the market from the coal mine are lump, broken, egg, stove, pea and buckwheat.  All these sizes; except pea and buckwheat, pass over a screen with a five-eighths inch mesh ; buckwheat will pass through a three-eighths inch screen, but pea will pass over it, but will not pass over a five-eighths inch screen.] [3]

" 12. At the time the lease in question was made all these varieties of coal were known commercially and were sold in the market, except buckwheat.  It does not clearly appear what size pea coal was in 1871.  There was evidence that it would pass over a half-inch mesh, but no evidence that it would pass over a five-eighths inch mesh.  Buckwheat does not appear to have been sold until 1885.  During this time, however, some part of the pea coal—there being no demand for it—went on the culm or refuse heap.

" 13. The Nottingham colliery is a model colliery.  It draws its coal from some twenty-five properties ; has a capacity of three thousand tons in a day of ten hours, and cost $600,000, although it could be replaced for $400,000.  At this colliery the effort was to make nothing but lump coal.  And no other sizes of coal were made there except to the extent that their production was incidental to the preparation of lump coal.  At the Reynolds colliery very little lump coal was made, but the broken coal was sometimes put through the breaker a second time, which involves a greater amount of coal breaking into small lumps, and consequently a greater product of pea and buckwheat coal and a less product of coal passing over a screen with a five-eighths inch mesh.

" 14. The Reynolds and Nottingham collieries had together

one culm heap, situated about a half mile from the property of the lessor. No coal has ever been removed from this culm heap by the defendant.

"15. The following statement shows the amount and prices of pea and buckwheat coal mined from the lessor's property and sold by the defendant, from the year 1875 to the year 1891, inclusive : [Statement omitted; the amount received was over $90,000.]

" The lessor was aware, certainly during a portion of this time, of the sale of this coal by the defendant, and he objected to it. He also objected to the location of the culm heap outside his own property. [It would not, however, have been practicable for the company defendant to have worked the lessor's property by a separate breaker erected on that property.] [9] By this is meant that, it being customary to work several properties through one colliery, a company having several properties could not profitably work them if it had to erect a separate breaker on each property.

"16. About one thirteenth of the total amount of coal mined and sold down to December 31, 1891, from the lessor's property through the Nottingham colliery, was pea coal; and about one eighth of that mined and sold through the Reynolds colliery was pea coal.

"17. In mining the coal, when the defendant would get down to the bottom of a vein in the plaintiff's property, it would throw back on the gangways rock and bony coal to the depth of two or three feet; and on top of this would then lay the sills on which the rails of the car tracks rested, so that the tracks over which the cars ran did not rest upon the ground at the bottom of the vein, but rested upon a layer of rock and coal two or three feet in height above the bottom.

"18. Coal from adjoining properties was hauled through the Lance property to the foot of the shaft, where it was raised to the surface, and the same is true of the coal which was mined from the Lance property; that also was hauled through other properties to the foot of the shaft.

"19. The marketable coal from the Lance property, which was placed on the culm or refuse heap, was placed there together with unmarketable coal from other properties, and all mixed up together, and there is no way to distinguish what is plaintiff's coal from what is somebody else's coal.

" 20. [There is no evidence of either the number of tons of plaintiff's coal in the culm heap, or of its value per ton.] [10]

" 21. It does not appear that Lance ever made any claim for compensation on account of coal hauled by the defendant from other properties across the gangway in his mine.

" 22. The defendant has never refused to allow the lessor to take away coal from the culm heap. On the contrary, he was notified to go there and take it.

" 23. The number of tons of coal which was hauled from other properties through the plaintiff's property to the foot of the shaft was $1,040,491\frac{18}{20}$.

" 24. There is no evidence of any custom to pay a toll for hauling coal from one man's mine through another man's mine, but there is evidence that it was worth about five cents a ton in this case.

" 25. At the time the lease in question was made, in 1871, while coal smaller than chestnut coal, that is pea coal, was a marketable commodity, there was not such a demand for it as has grown since. The more extended use of bituminous coal during the last twenty years has made it necessary to devise means for using anthracite coal not generally, if at all, in use in 1871, and the result of this effort has been to create a greater market for the smaller sizes of anthracite coal, and it has therefore become profitable to break up the coal, and necessarily in this way to increase the amount of coal that will not pass over a screen of five-eighths inch mesh.

### " OPINION.

" The decision of this case necessarily depends to a great extent, if not entirely, upon the meaning of the lease of the coal property in question, made by the plaintiff to Thomas Broderick et al., on Oct. 1, 1871. The defendant is in possession under an assignment from the Lehigh Coal and Navigation Co., to whom the original lessees had previously assigned their interest in the lease.

" The plaintiff leased to the lessees, their executors, administrators and assigns, ' all the anthracite coal upon and under the said parcels of land, as above described, with the right and privilege to enter upon and mine and remove the same,' for the term of ninety-nine years. The lessees were to pay to the les-

sor, his executors, administrators and assigns, 'twenty-five cents per ton of two thousand two hundred and forty pounds of coal mined from the premises described, that will pass over a screen of five-eighths of an inch mesh.' The lessor was to have ' all the culm or refuse coal from the mines,' and the right and privilege of entering upon the premises at any time and removing the same.

" Under the decisions of this state, commencing with Caldwell v. Fulton, 31 Pa. 475, and including Lillibridge v. The Coal Co., 143 Pa. 293, this lease created an ownership of the coal in the lessees, or their assigns, during the period of the lease, just as absolutely, and the same in character, as if it had been a lease of the surface of the land for ninety-nine years. As long as the lessees paid the rent reserved they would have the right to the possession of the coal and to mine and remove it ; and were there no provisions in the lease that the lessor should be the owner of the culm or refuse coal, there would be nothing upon which to base the claim which the plaintiff here makes to be paid for the pea and buckwheat coal which the defendant has sold, and for the value of the culm or refuse coal which he alleges the defendant has converted to its own use. It is therefore necessary to decide what is meant in this lease by the twelfth paragraph, which is in these words : ' The party of the first part shall have the culm or refuse coal from the mines, and shall have the right and privilege to enter upon the premises at any time and remove the same, but the said parties of the second part may use so much of the culm as may be necessary for any purposes about their works.'

" It is contended by the plaintiff that the words ' culm or refuse coal ' include all the coal which will not pass over a screen with a five-eighths inch mesh, and it is urged that if this is not the correct construction then the plaintiff would have no security for the payment of rent to him whatsoever, because the lessee might break up the coal so that it would not pass over such a screen and yet be marketable coal, which he could sell and still be under no obligations to pay royalty on it. This does not seem to be the proper construction of the lease. It does not expressly provide that everything which does not pass over a screen with a five-eighths inch mesh shall belong to the lessor. If he is entitled to so much, it must be by force

of the provision just quoted giving him all the culm or refuse coal.

" [The evidence very clearly establishes that what is meant by culm or refuse coal, as these terms are used in mining leases, is that part of the coal which in preparing the coal mined for the market goes upon the culm pile. It may include any size coal if placed on that pile, and, as a matter of fact, it has, and does even now, sometimes include a certain amount of chestnut coal, which is a coal that will pass over a five-eighths inch mesh.] [4]   Taking, then, this definition of the words culm or refuse coal, there is no provision in the lease which gives the lessor all the coal which passes through a screen with a five-eighths inch mesh ; and the answer to the argument that unless he is given all such coal, he has no security for the payment of the stipulated rent or royalty is plain.

" The lessor is entitled to twenty-five cents a ton for all coal which will pass over such a screen as the lease calls for.   By the words ' will pass over ' is evidently meant ' when treated,' to use the language of the lease itself, ' in a judicious and careful manner ' for the purpose of ascertaining what coal mined will pass over such a screen.   It is true that the lessee would probably be entitled to adopt such improvements in the construction and operation of breakers as might from time to time be introduced, and while he would also have the right to so arrange and operate the breakers as to break up a large quantity of the coal into smaller sizes, to meet the demands of the market, yet to the extent to which he thus diminished the amount of coal that would pass over the screen called for in the lease he would be bound to pay the stipulated royalty per ton.

" The case itself affords a very good illustration of the limitation which a proper construction of the lease places upon the lessee in its preparation of its coal for the market.

" The evidence is that at the Nottingham colliery, where much the larger portion of the coal was prepared for market, the effort was to make nothing but lump coal, and that this colliery is a model colliery in its construction and operation. On the other hand, at the Reynolds colliery, where a much smaller portion of the coal mined from the lessor's property was prepared, the effort was not to make any lump coal, but to break up the coal into smaller sizes to meet the demands of

the market for smaller sized coal.   In doing this the relative
amount of coal which would pass through a screen with a five-
eighths inch mesh was considerably increased over the amount
which passed through the same sized screen at the Nottingham
colliery.   In other words, at the Reynolds colliery the amount
of pea and buckwheat and refuse coal was increased, for the
purpose of meeting the demands of the market for smaller sized
coal, and of course the amount of coal which went over the
screen of the size called for in the lease was diminished.

" The failure to include in the return of coal, on which the
royalty was payable, the number of tons which if not thus
broken up, would have passed over the five-eighths inch screen
at the Reynolds colliery was a violation of the right of the les-
sor, and to the extent to which he was damaged thereby he
would be entitled to recover at the rate of twenty-five cents a
ton for the amount of such shortage.

" Unfortunately, however, in the present case there is no
evidence to fix with any degree of accuracy this amount of
reduction in the coal, which would otherwise have passed over
the screen at the Reynolds colliery; and the plaintiff himself
has expressly abandoned any claim to recover for coal mined,
which should have been included in the returns made by the
lessee and which has not been so included. . He based this
part of the claim upon the construction of the contract under
which he insists that he is entitled to all the coal that goes
through the screen provided for in the lease, and that therefore
he is entitled to the value, at the mine, of the pea and buck-
wheat coal sold.   I think this is not the meaning of the lease,
and therefore must reject this part of the plaintiff's claim.

" As, however, a different construction may be placed on
the lease, it is proper to consider here the defences which have
been set up to this part of the plaintiff's claim, under the plain-
tiff's construction of the lease.   They are three in number : First,
that the plaintiff is concluded by reason of the settlement of
the accounts entered from time to time by the defendant;
second, that the plaintiff knew of and acquiesced without ob-
jection in the sale of the pea and buckwheat coal by the de-
fendant, and that he is estopped thereby from setting up any
claim for the value of such coal; and, thirdly, that the statute
of limitation applies, and that the claim must be confined to
coal sold within six years before suit brought.

" In support of the first ground of defence, the case of Dunham v. Haggerty, 110 Pa. 560, is cited. This case does not seem to go far enough to sustain the defence in the present case. The court say that the statements rendered by a coal company, of coal mined, to the lessor, are not like mutual settlements of accounts, and that if it be shown that the statements did not contain all that they should contain, they are not conclusive unless the party to whom they were rendered accepted them with a knowledge that they were not correct. I take it that this means that where the party to whom the accounts are rendered has knowledge that they are not correct, and accepts them without objection, that then in such case he is bound by the settlement; but when he objects all the time, as the plaintiff did in the present case, to the failure to pay him for pea coal, I do not understand this case, nor any case, as deciding that he is estopped by receiving the accounts and accepting payment according to the accounts, and I am of the opinion that the plaintiff in the present case would not be concluded from setting up the claim which he has set up by the fact that he has accepted the accounts of the defendant, in view of the other fact that he has always objected to their right to exclude pea coal from the coal on which they were bound to pay a royalty.

" In regard to the second point, I am of the opinion that there has been no such conduct on the part of the plaintiff as estops him from asserting this claim, if he is entitled under the contract to make it. The evidence, so far as there is any evidence on the subject, is that he objected to the defendant taking the pea coal, and I think it is not material whether he objected or not. If he had the right to the pea coal under the contract, nothing would deprive him of it unless he released the right, or did some act which would make it inequitable for him to assert the right against the defendant, or unless he is barred by the statute of limitation: De Bussche v. Alt, 8 Ch. D. 286–314. The so-called equitable estoppel upon which the defendant relies amounts to nothing more, according to its own allegation, than that the plaintiff saw that the pea coal was being sold and that he did not make any claim for it. I take it that this would not estop him from subsequently making the claim.

" The objection of the statute of limitation was based upon

the ground that an action of covenant could not have been sustained by the lessor against the defendant, because the intermediate assignment of the lease from Broderick to the Lehigh Coal and Navigation Co. was not sealed by the assignee, and the case of Maule v. Weaver, 7 Pa. 329, was relied upon.

" In my judgment, this case has no application to the present one. Had there been a suit against the Lehigh Coal and Navigation Co. under the prior assignment, it would have been pertinent, but the present action is against parties who did execute the assignment which provided that it was made 'subject to the performance by the Lehigh and Wilkes-Barre Coal Co., its successors and assigns, of the covenants and agreements of the said The Lehigh Coal and Navigation Co. for themselves and for Thomas Broderick, Thomas D. Conyngham and T. Frank Walter in the said lease contained.'

" Even if the defendant be right in its contention that an action of covenant could not have been sustained on the deed from Broderick and others to the Lehigh Coal and Navigation Co., because it was a deed poll and not signed or executed by the Lehigh Coal and Navigation Co., nevertheless, that assignment created certain obligations so far as the Lehigh Coal and Navigation Co. was concerned, and the subsequent assignment by it to the defendant, which was executed by the defendant under seal, whereby the defendant undertook to perform the obligations that existed under the original lease and the assignment thereof, would entitle the original lessor, although he was not a party to the last assignment, to sue upon it, he being the only party really interested in the performance of the covenants. See Delp v. Brewing Co., 123 Pa. 42.

" The next part of the plaintiff's claim is for the value of the coal which went on the culm heap, and which he alleges was converted by the defendant to its own use. It was objected to this claim that it was an action outside of the contract, and not an action on the contract. It was said that the lease gave the right to the lessor to have the culm or refuse coal, but that it was not the sort of a right that could be enforced by an action of covenant, although the lease was under seal. The difficulty with this view of the case arises from what the lease itself provides. At the very beginning we find this clause : ' And the said William L. Lance, for himself, his heirs, executors,

administrators and assigns, and the said Thomas Broderick, Thomas D. Conyngham and T. Frank Walter, for themselves, their executors, administrators and assigns, do by these presents mutually promise, covenant and agree, to and with each other (every specification hereinafter numbered and written out to be deemed and considered as separate and distinct covenants), to do, perform, keep and observe the several undertakings and agreements upon the part of each as hereinafter stated, named and particularly specified.'

" The parties themselves have defined this particular provision, to wit: The twelfth provision of the lease, to be a covenant to be enforced against both parties and their assigns. This would seem to be a complete answer to the objection.

" The first question which arises is: Has there been a breach of this covenant? [The culm heap was not placed on the land of the lessor. It was argued that this was a breach of the covenant. In my opinion it was not.] [14].

" The fourth clause of this lease provides that for the purpose of 'making openings, erecting a breaker and necessary machinery, constructing railroads for sidings, and depositing culm, the said party of the second part shall have so much surface as may be necessary for breaking and operating, and removing the coal mined upon the premises,' between certain lines, and then provides that if more should be necessary it might take as much more as was needed by paying three hundred dollars a year per acre for the use of it. This provision seems to have been one in ease of the lessee. It is one giving it the right to the use of land if it sees fit to use it, but it was not one making it obligatory upon it to put its breaker upon the land of the lessor, and its failure to do it, therefore, would not be a breach of the covenant.

" It was contended further that mixing up the lessor's refuse coal with the refuse coal from other properties mined through the same colliery in one common culm heap, amounted to a conversion of property which belonged to him.

" In view of the fact that it was customary to mine several properties through one colliery, and that it would not be practicable to erect a breaker with its culm heap upon each separate tract where several properties were being mined together, [I think this cannot be considered as a violation of the lessor's rights under the lease.] [15]

" It was admitted that no coal was ever taken away from the culm heap, and as the defendant has never refused to allow the plaintiff to enter and haul away coal from this culm heap, there is not sufficient evidence to warrant a finding that there has been any breach of the lease in this particular, and if there was, [there is no evidence to show what amount of refuse coal mined from the Lance property went on the common heap, nor the value of it.] [16]   There was evidence that one man, McFarland, had screened chestnut, pea, and buckwheat coal from his culm heap, which was worth a certain amount.   This would not be sufficient in itself to make a finding, even if there had been a breach of the covenant, which in my opinion there had not been.

" The only remaining claim of the plaintiff is a charge for carrying coal from other mines across the bottom of his mine to the foot of the shaft.   There was an attempt to prove that there was a customary charge for this.   Such a custom was not proved.   One witness testified that in his judgment a fair price for such a use of the plaintiff's property would be five cents a ton.   [This evidence is not sufficient, in my judgment, to establish a reasonable price,] [18] because it was based upon a theory of the probable damage one joint lessor would suffer by having an adjoining mine worked through his mine, instead of having his own property mined.   No such condition was proved to exist in the plaintiff's case, and in view of the fact that this coal was hauled on a railway resting on a bed of rock and refuse coal, some two or three feet high, which was thrown back from the side chambers into the main gangway for the purpose of making a foundation for the railroad, I am of the opinion that, under the decision in Lillibridge v. The Coal Co., 143 Pa. 293, already cited, [the plaintiff could not recover, even if he had shown how much the plaintiff was reasonably entitled to have paid him for hauling through his property the coal which the defendants so hauled from adjoining mines.] [19]

" This disposes of all the plaintiff's claims.   The demurrer to the plea of the statute of limitations is sustained.   Upon the other two pleas the finding is for the defendant, and it therefore is ordered that judgment be entered in favor of the defendant."

Exceptions, among others, to the portions of the referee's report included in brackets were dismissed by the court.

*Errors assigned* were dismissal of exceptions, quoting them respectively.

*John G. Johnson,* for appellant.

*Samuel Dickson,* for appellee.

Opinion by Mr. Justice Fell, July 12, 1894:

This was an action to recover damages for the alleged breach of a mining lease in which the plaintiff was lessor and the assignors of the defendant were lessees.

The plaintiff's claim was for: 1st, the amount received by the defendant from the sale of pea and buckwheat coal from 1875 to 1890; 2d, the value of culm or refuse coal mined in the tract leased but removed therefrom; 3d, compensation for the carriage of coal from other properties of the defendant through the mine leased. The action was referred by agreement to S. S. Hollingsworth, Esq., as referee, who found for the defendant as to all the claims.

The main controversy was as to the first of these claims, and the provisions of the lease pertinent to it are:

" 2d. The parties of the second part, their executors, administrators and assigns, shall pay to the party of the first part, his administrators and assigns, twenty-five cents per ton of two thousand two hundred and forty pounds of coal mined from the premises that will pass over a five-eighths of an inch mesh."

" 12th. The party of the first part shall have all the culm or refuse coal from the mines, and shall have the right and privilege to enter upon the premises at any time and remove the same, but the said parties of the second part may use so much of the culm as may be necessary for any purposes about their works."

The referee found as a fact from the testimony that " culm or refuse is the coal which passes through the screens of the breakers and is then placed in what is known as the culm or refuse heap. It is unmarketable coal, and may according to the demands of the market, include at one time what is marketable at

another time." And he was of opinion "that within this meaning of the words the lessor was not entitled by the provisions of the lease to all the coal which passed through a screen with a five-eighths inch mesh."

This finding of the learned referee seems to us to be fully sustained by the testimony and the construction of the lease.

At the time the lease was made, 1871, there was not a general market for what is known as pea and buckwheat coal, or for sizes that would not pass over a five-eighths inch mesh. They were not considered of sufficient value to justify the payment of a royalty. They went to the culm or refuse or dirt pile. These piles were of no value, and a source of annoyance and expense to the miner, but the belief existed then as now that in the future means might be devised to utilize the large quantities of good coal which they contained. Negotiating on this basis of fact and belief, the lessee was relieved from payment for unmarketable coal, and the lessor given title to that which cost him nothing and had only a prospective value. The word culm was doubtless brought to the Pennsylvania coal fields by Welsh miners. With them the word has been used to describe an inferior grade of coal of but little value, and it readily came into use to define coal not inferior in quality but unmarketable and valueless because of its size. It was the adaptation of a word to a use closely akin to its original meaning. The words "culm or refuse coal," as used in the lease, meant refuse coal—that is to say, coal refused by the lessee because it was unsalable, and which of necessity, to make room for the operation of the works, was removed and thrown into a pile.

The lease included all the coal on the land, and the provision as to the sizes on which no royalty was to be paid was a stipulation in favor of the lessee, not a reservation of anything of value by the lessor.

We are of opinion that all the questions which arose in the case were properly decided by the learned referee, and the judgment is affirmed.