AUGUSTA G. GENET, Respondent, *v.* THE PRESIDENT, MANAGERS AND COMPANY OF THE DELAWARE AND HUDSON CANAL COMPANY, Appellant.

CONTRACT — LEASE FOR MINING COAL — AGREEMENT BY LESSEE TO PAY FIXED ROYALTY ON COAL OF DESIGNATED SIZE AND QUALITY — WHEN LESSOR IS ENTITLED TO ROYALTY ON COAL OF INFERIOR SIZE AND QUALITY. Where the lessee of coal lands agreed to pay a certain royalty per ton for all coal of a designated quality and size taken by it, the contract being silent as to payments for coal of inferior quality or smaller size, and it has been held in a previous action between the parties that "the lessee was not obliged to take coal of inferior size or quality, but it had the right to take such coal if it chose, in which case it was bound to pay royalty upon it the same as upon other coal;" the asportation of coal, of inferior size and quality, from the lands of the lessor to the lands of the lessee and mingling it with coal of similar size and quality owned by the latter, thereby exercising exclusive control and dominion over such coal and removing it beyond the power of the lessor to assert her ownership thereof, constitutes an exercise of the lessee's option to take all of such coal as marketable coal under the contract, so that the lessor is entitled to the payment of the royalty thereon.

*Genet* v. *D. & H. Canal Co.*, 110 App. Div. 867, affirmed.

(Argued October 24, 1906; decided December 4, 1906.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered January 5, 1906, affirming a judgment in favor of plaintiff entered upon the report of a referee.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Frank E. Smith* for appellant. There has been no taking or appropriation of the culm heap or the coal contained in it. (*Parsons* v. *Parker*, 159 N. Y. 16; *Shaw* v. *Wallace*, 25 N. J. L. 455; *Marvin* v. *B. I. M. Co.*, 55 N. Y. 538.)

*Learned Hand* for respondent. The asportation of the culm across the Lackawanna river was an election to accept it under the contract. We do not claim that the mere mining of the culm constituted an election to accept it, as the defendant seeks to assume. (*Knatchbull* v. *Hallet*, L. R. [13 Ch. Div.] 696; *I. & T. Bank* v. *Peters*, 123 N. Y. 272; *Matter of Holmes*, 37 App. Div. 15; 159 N. Y. 532; *Blair* v. *Hill*, 50 App. Div. 33; 165 N. Y. 672.)

Chase, J. . On the 28th day of March, 1864, the plaintiff (her husband joining with her) made an agreement with the defendant by which she leased to it " all the coal contained in, on or under " certain real property at Scranton, Pennsylvania, therein described. That agreement and the work performed by the defendant in mining and marketing coal from said lands have been fruitful sources of litigation. Plaintiff and defendant have been wholly unable to agree upon a construction of the terms of the agreement or as to their respective rights in connection with the work of mining and marketing the coal under said agreement. Appeals from judgments in actions relating thereto have been repeatedly heard in this court and they are reported in 86 N. Y. 625; 113 N. Y. 472; 122 N. Y. 505; 136 N. Y. 593; 163 N. Y. 173; 167 N. Y. 608; 170 N. Y. 278.

The terms of said agreement are stated, so far as material, in the consideration of the question now before us in a report of the opinion at Special Term in one of the actions between the parties found in 13 Miscellaneous Reports, 409, and also in 122 N. Y. 505, and 136 N. Y. 593. It is quite unnecessary on this appeal to attempt to state in detail the history of the

litigation between the parties, or as to what has been decided in the several cases in this and other courts, except as the decisions have special reference to the question now involved.

When the agreement was executed, coal that would pass through a mesh one-half inch square was not sent to market, and for several years thereafter such coal was thrown upon the culm pile. The culm pile was then situated on the surface of the plaintiff's land. At a subsequent time smaller sizes of coal were taken from the culm pile and marketed by the defendant.

It appears from the opinion reported in 163 N. Y. 173 that the plaintiff claimed that under the agreement the defendant had no right to take any coal except such as would not pass over a half-inch mesh, and that the title to the smaller coal remained in her, and she brought an action to recover among other things the full value of such small coal. The value of such small coal exceeded the stipulated royalty of twelve and one-half cents per ton which the defendant was required to pay for coal that passed over such half-inch mesh. She recovered a judgment for its value in the Supreme Court. The judgment was modified in this court by reducing her recovery to an amount equal to twelve and one-half cents per ton for the small coal so taken by the defendant, and in construing the agreement this court said : " It will be seen that in the provision as to royalties already cited the lessee is required to pay 12½ cents a ton, not for all coal, but only for all 'merchantable' coal that will not pass through a half-inch mesh. Now, merchantable is not to be construed in its ordinary sense, for these parties have adopted a terminology of their own, and by the contract exactly defined the meaning of 'merchantable.' 'It is further mutually understood and agreed that the term 'merchantable coal' shall be understood and defined as follows, to wit : That all coal mined under this agreement shall be with the same expense of mining and cleaning, of as good quality as the average of coal taken from other mines and sent to market by the said party of the second part, and that it shall be subject to the inspection of the superintendent of the said party of the second part or

such other person as they may employ for that purpose whose decision as to quality of said coal shall be final and conclusive.' It is not only entirely possible, but very probable that at times large quantities of coal have been taken from these lands either not of as good quality as the average of the defendant's other coal, or if of as good quality, mined at greater expense than other coal. Yet, though the coal may have been of somewhat inferior quality or mined at somewhat greater expense than other coal, its mining may have been most profitable to the appellant. Still, under the contract, it would not be merchantable coal. No distinction can be drawn between the two provisions, one, that the coal shall not pass through a half-inch mesh, and the other, that it shall be merchantable. If the appellant's contention is correct, then on all this coal, profitable as its mining may have been, the defendant is exempt from the payment of royalty, while if the plaintiff's claim is to prevail, she was entitled to all this coal, and the defendant could take none of it, though its labor in mining and preparing coal had contributed probably nine-tenths of its value."

The court in that case discussed the provisions of the agreement relating to the defendant being relieved from further mining operations and then say: " They are merely privileges or options afforded the defendant of which it might avail itself or not as it saw fit. Mining might become unprofitable; but this of itself would not terminate the contract. The lessee, nevertheless, could still continue the prosecution of the work in the expectation that the situation would change, but if it did take out coal the obligation rested upon it to pay the royalty for it. The same is true, in our opinion, as to the provisions relating to the size and merchantable character of the coal. *The lessee was not obliged to take coal of inferior size or quality, but it had the right to take such coal if it chose, in which case it was bound to pay royalty on it the same as upon other coal.*"

It appears from the record that the purest coal contains about 90% of carbon, average coal about 84%, while coal to

be accepted in the market must contain at least 65% of carbon. Material containing from 40 to 65% of carbon is classified as bone, and when it contains less than 40% of carbon it is classified as slate or rock. All of the material taken from the plaintiff's land is not of the same richness in carbon, but some bone, slate and rock is mingled with the richer or purer coal. It is claimed by the plaintiff that all of the material so removed from her land is composed of the same ingredients and that it differs only in the proportion of carbon and other substances contained in it. Some portion of the inferior material passes through the breakers and it is mingled with the richer coal. It is accepted in the market so long as the average percentage of carbon in the marketed product is not materially affected.

The defendant mines coal from lands other than those included in the lease from the plaintiff, and coal so mined is taken from the mines underneath such other lands through tunnels from said lands to the opening or shaft on the plaintiff's land, where it is elevated to the surface of the ground and to the breakers, and the coal so taken from the land of the plaintiff and others respectively leased to the defendant and from the lands owned by the defendant are mingled in the breakers and each person interested obtains a statement of the amount of coal marketed from the lands in which he is so interested, by having the cars filled with coal from the lands so leased by them respectively tagged and counted and their proportion respectively of the full amount marketed is thus established by computation. The coal that passes through meshes now used by the defendant and inferior grades of coal and material denominated "pickings" from all the coal taken from the mines so mixed in the breakers is sent to and mingled in one culm pile and the interest of any person by reason of the ownership of a particular mine in such culm pile is established by proportion as is done with the coal that is actually sent to market.

Prior to 1892 the culm pile produced from the breakers used in connection with the shaft on the plaintiff's land was

upon the plaintiff's land and the culm from the coal taken from the plaintiff's land was a part only of the total amount in such culm pile. Since 1892 the defendant has taken the culm as produced across the Lackawanna river adjoining the land of the plaintiff and piled it onto lands owned by it. In this action the plaintiff claims to recover 12½ cents a ton for all of the material taken from the mines in her property since 1892 less such amount as she has been paid on account therefor, and she insists that the defendant has exercised its option and accepted all of the coal mined as merchantable coal under the agreement and that as it has taken all of such material it must within the terms of said decision reported in 163 N. Y. 173, pay her therefor as merchantable coal.

The referee has found the number of mining cars of *coal* taken from the plaintiff's land in each of the years for which plaintiff claims to recover in this action, and he also finds that the defendant has mined and taken *coal* out of the plaintiff's land separating from it and leaving in the mine so far as practicable such rock or slate or other foreign substances as may be attached to or inclosed in the coal in the vein, or mixed with the coal in mining it and he also finds that the *coal* so separated from the rock or slate and other foreign substances is loaded into the cars and taken out of the mine, and he further finds: "The *coal* in the cars is then inspected and if it is found to contain more impurities than a certain proportion *fixed by the defendant*, some portion of the contents of that car is rejected and the miners' price for mining is reduced accordingly.

"The contents of the car are then emptied into the breaker and crushed and broken into smaller pieces which are separated into sizes, the bone (which is an inferior quality of coal and not separately salable or usable) and the slate or rock mined with the coal and picked out and they, with the coal that is too small to pass over a seven-sixteenths-inch mesh, become culm, which is carried by the defendant from the plaintiff's land over the Lackawanna river to the culm pile or dump *on the defendant's land where it still remains in*

*possession of the defendant,* except perhaps, seventy-five tons per day of the culm which are taken without selection at the breaker by screening over a one-quarter-inch shaker and carried to the furnaces and there used as fuel by the defendant under its boilers without other preparation while the other part of the contents of the mining cars is sent to market and sold by the defendant."

A part of the contents of the culm pile consists of coal having as large a percentage of carbon as the coal sent to market, but such part consists of particles that pass through the meshes that are used in selecting the coal for market. It is not disputed that such part of the culm pile amounts to at least 40% of the total quantity thereof, and that there is now a process by which it is practical to remove such 40% from the remainder of the culm pile. That part of the culm pile which would remain after removing the fine particles of coal as stated, contains some percentage of carbon and specimens of such culm taken at random from the pile were produced on the trial and they show from 35 to 70% of carbon.

There is evidence in the record tending to show that the culm pile as it now exists on the defendant's property is marketable at some price. The defendant did not keep the coal that passed through the meshes separate from the bone and slate that were thrown aside as pickings, but transported the same mingled with the culm from coal mined in other lands to a common pile on its own land.

There has been no suggestion to the plaintiff or otherwise that the plaintiff's rights in the culm pile would be or are in any way preserved, but it is evident that during the times mentioned in the complaint the culm was so transported by the defendant to its own lands under the claim that the defendant was the absolute owner thereof, by reason of the payment of 12½ cents per ton for the coal that had passed over a one-half-inch mesh.

Plaintiff was and is entitled to 12½ cents per ton for the coal which defendant accepts as merchantable, and any culm that it does not so accept is the property of the plaintiff.

The election or option which rests in the defendant to determine the quality of coal which it will accept under the contract should be exercised within a reasonable time in consideration of all the circumstances.

We are of the opinion that the defendant, by mingling the culm from the different mines, together with its taking unqualified possession and exercising full and exclusive dominion over the same, and in removing it beyond the power of the plaintiff to assert her ownership of the culm from the coal mined on her lands, has exercised its option in favor of taking all of the material mined as merchantable coal under the contract. There is at least some evidence in the record to sustain the findings of the referee, and also from which to find that the option has been exercised by the defendant in favor of taking all of the material mined as coal, and, as we have seen, it has been determined as between the parties that such taking entitles the plaintiff to payment of the royalty.

The judgment should, therefore, be affirmed, with costs.

Cullen, Ch. J., Edward T. Bartlett, Werner, Willard Bartlett and Hiscock, JJ., concur; Gray, J., absent.

Judgment affirmed.