## STATE v. HOBART IRON COMPANY.[1]

### No. 21,231.

### June 13, 1919.

**Mine and mineral — state lease — royalty on crude "wash" ores.**

By the state mining lease lands are leased "for the purposes of exploring for, mining, taking out and removing therefrom, the merchantable shipping iron ore." The lessee agrees to pay the state "for all the iron ore mined and removed * * * at the rate of twenty-five (25) cents per ton." In defendant's mine operated under a state lease is a body of low grade ore which cannot be used in the furnaces under present furnace methods. It can be mined and washed in a washing plant constructed upon the leased premises and the concentrates be shipped to the furnaces and sold and a profit result after paying the mining, washing and transportation charges and the royalty. No profit will result if the mined ore is shipped to the furnaces, and washed there, the cost of transportation being such as to prevent.

*Held*, that the mined iron ore before washing is the ore referred to in the lease and upon it the lessee must pay the royalty of twenty-five cents per ton and not upon the lesser tonnage of concentrates.

### March 5, 1920.

**State mining lease — cases followed.**

1. The state mining lease is a lease in fact and not a sale of ore in place, following former decisions.

**Same — due process of law.**

2. The holding that a lessee under a state mining lease, taking low grade ore from the mine in the manner of ordinary good mining, must pay on the tonnage of the product, although under present furnace methods it is not directly usable in the furnaces, and not on the reduced tonnage of concentrates resulting from such product after it is taken to the washer and there treated or "beneficiated," does not offend the contract or due process provisions of the Federal Constitution.

[1]Reported in 172. N. W. 299, 175 N. W. 100.

Action in the district court for St. Louis county to recover a balance of $1,401.75, royalty due under a state mining lease.

The answer alleged that plaintiff had been paid in full for all the iron ore defendant had taken out, mined and carried away from the Majorca mine up to July 1, 1918; that all the iron ore taken by defendant was weighed by the railroad company and the total weight thereof was 28,421 tons. It further alleged that the merchantable shipping iron ore is to a considerable extent mixed with sand and silica, dirt, rock and useless materials; that by means of a "washing plant" the iron ore and other materials were separated by washing and the useless materials other than iron ore were deposited and left on the premises and the process was carried on in the usual manner on the Missabe range; that no more of such materials was separated in such process than was necessary and no merchantable iron ore was wasted; that in such process defendant separated and deposited and left on the property 5,067 tons of such sand, silica, dirt, small rocks and other useless material from 10,414 tons of the merchantable iron ore which it handled through such washing plant, and alleged that it was on account of this material that plaintiff sought to recover on the theory that defendant is required to pay for the total weight of material lifted from the mine to the washing plant and before materials other than iron ore have been separated therefrom. A demurrer to the answer on the ground that it did not state facts sufficient to constitute a defense, was overruled.

The case was tried upon an agreed statement of facts before Dancer, J., who made findings and ordered judgment in favor of defendant. From the judgment entered pursuant to the order for judgment, plaintiff appealed. Reversed.

*Clifford L. Hilton,* Attorney General, and *Egbert S. Oakley,* Assistant Attorney General, for appellant.

*Washburn, Bailey & Mitchell,* for respondent.

*Hoyt, Dustin, McKeehan & Andrews, Horace Andrews, William P. Belden* and *John B. Putnam,* filed a brief on reargument as amici curiae.

*Leon E. Lum* filed a brief on reargument as amicus curiae.

DIBELL, J.

This is an action by the state to recover royalties upon a mining lease. There was judgment for the defendant and the state appeals.

The defendant operates the Majorca mine under a lease from the state. The lease was granted to its assignors in 1902, and is in the statutory form. Laws 1895, p. 227, c. 105, § 4; G. S. 1913, § 5315. It recites that the premises are leased "for the purposes of exploring for, mining, taking out and removing therefrom, the merchantable shipping iron ore, which is or which hereafter may be found," etc. The lessee agrees to pay "for all the iron ore mined and removed * * * at the rate of twenty-five (25) cents per ton, for all iron ore so taken out, mined and carried away." It is provided that the "iron ore so taken * * * shall be weighed by the railroad company transporting the same from said land; which weight shall determine the quantity as between the parties hereto." There is reserved the right to inspect and test the scales and weights, and errors are subject to correction. The lessee is required to "open, use and work the said mines in such manner only as is usual and customary in the skilful and proper mining operations of similar character," etc. There is a minimum output provision.

The general question is whether a lessee under such a lease who mines and treats so-called "wash" ores must pay royalty on the crude ore or the concentrates, and the precise question presented for decision is whether when such lessee takes from its natural bed low grade iron ore, not directly usable in the furnaces under present furnace methods, and subjects it to a washing process in a washing plant constructed upon the leased premises, from which concentrates result which are usable in the furnaces and which have such value that the ore may be mined and washed and the concentrates transported to the furnaces and sold at a profit after paying 25 cents per ton royalty on the crude ore, although because of transportation charges the crude ore could not be shipped to the furnace and washed there and sold at a profit, must pay royalty on the ore before washing or on the concentrates.

This question is presented on this concrete state of facts: The defendant has in a portion of the Majorca mine an estimated body of 1,500,000 tons of iron ore whereof 350,000 tons have an average

of 55.58 per cent metallic iron, designated by the parties standard ore, and 1,150,000 tons have an average of 45 per cent of metallic iron, designated by the parties low grade ore. In April, May and June, 1918, it removed from its place in its natural bed, in addition to certain standard ore, 16,021 tons of low grade ore, submitted it to a washing process in a washing plant constructed on the premises, and as a result obtained 10,414 tons and 140 pounds of concentrates. The remaining 5,607 tons was waste and was left on the premises. The decrease in tonnage through the washing process was substantially one-third. The 16,021 tons was not directly usable in the furnaces under present furnace methods. Neither, if there was a washing plant at the furnaces, could it have been mined and shipped to the furnaces and washed there and a profit obtained upon the sale of the concentrates, the cost of transportation being such as to prevent a profit. The 10,114 tons of concentrates was directly usable in the furnaces, could be shipped from the washing plant to the furnaces and sold at a profit after paying all mining, washing and transportation charges and the state royalty of 25 cents, whether such royalty was based on the 16,021 tons subjected to the washing process, or the 10,414 tons of concentrates resulting.

These are the essential facts stated briefly. They are stated concisely and in greater detail in the findings and a quotation at length of a portion of them will conduce to a completer understanding:

"f. That during the months of April, May and June, 1918, the defendant mined and removed from said property 18,007 tons and 300 pounds of said standard ore, which was shipped and weighed without washing, and from which such dirt and rock, and other useless material as it was practical to separate by hand, or with a shovel, had been so separated and left on the property in the ordinary, customary and usual way that the mining of such ore is carried on upon the Mesaba Range; and during said months removed from its natural bed on such premises 16,021 tons and 140 pounds of such low grade ore, and carried by tram cars the same to and treated the same in said washing plant, and that by said washing process defendant produced from the low grade ore so washed 10,414 tons and 140 pounds of concentrates, which it shipped from said property and which as so shipped was merchantable shipping iron ore. That said weights were determined by the railroad company

transporting the same from said property and as the fact is. That 5,607 tons of sand, silica, dirt and other useless material were removed from such low grade ore by the washing thereof and were deposited by the defendant in a sludge pond situate along the northern line of and upon said S.½ of S.E.¼ of said section 9 and left upon said property. That such washing process was carried on in the usual, customary and generally approved manner on the Mesaba Range, and no more of such waste and useless material other than iron ore was separated from said iron ore than was necessary to separate said iron ore, and no iron ore was wasted in such process and that the said concentrates contained no greater percentage of iron- ore than necessary to make the same merchantable.

"g. That said standard ore as mined was suitable for furnace use without further treatment. That said low grade ore removed from its natural bed as aforesaid was not adapted to furnace use under present known methods. That said low grade ore on account of transportation charges could not have been conveyed to furnaces, there treated by such washing process, and the concentrates obtained therefrom and thereat sold at a profit; that is to say, the value of such concentrates, obtained by such washing process at furnace points, was less than a sum equal to twenty-five cents (25c) per ton on such low grade ore, the cost of mining, transporting and washing the same and marketing said concentrates.

"h. That the low grade ore so mined by defendant during April, May and June, 1918, and thereafter subjected to treatment in said washing plant was mined, washed and marketed at a profit in this way; that is to say, the said 16,021 tons and 140 pounds of low grade ore so treated in such washing plant produced concentrates in the following amounts, to-wit: 10,414 tons and 140 pounds, which concentrates were of a market value greater than the sum equal to twenty-five cents (25c) a ton on said 16,021 tons and 140 pounds of low grade ore and (plus) the cost of mining and washing said low grade ore and transporting and marketing said concentrates."

The trial court held that the royalty was payable on the concentrates, and not upon the crude ore as it came from the mine. The defendant had paid on the basis of the concentrates and judgment was therefore

in its favor.   We have reached the conclusion that royalty was payable on the crude ore.

The tendency is constant for low grade iron ore to come into the class designated as merchantable shipping iron ore.   Improved furnace methods and improved methods of treatment make iron ore usable which before such methods was not usable.   More efficient mining methods and better transportation conditions make it profitable to mine and ship ore which, though usable, could not be mined and shipped at a profit if less efficient methods in mining and transportation were used.   Gradually lower grade ores become capable of use and are mined and marketed at a profit.

The low grade ore, just as the standard ore, is iron ore.   It has an iron content distributed through it with considerable uniformity which gives it value notwithstanding the presence of the silica and sand and other waste substances with which it is intermixed.   Its value is not prospective only. . It has a value, or some of it has, for present use.   It differs from the standard ore in quality and value, and it differs in this respect, important in this litigation, that it cannot be used in the furnaces under present known furnace methods in the condition in which it comes from its natural bed in the mine after the removal from it of such dirt and rock and other waste material as it is practical and customary to remove by hand or pick or shovel or otherwise in ordinary good mining.   Indeed this particular difference makes this litigation: for, if the ore as it comes from the mine were usable in the furnaces without washing, the defendant would not claim that the royalty should be based on concentrates.   If the usability in the furnaces of the ore as it comes from the mine in the usual course of good mining is the test whether it is "merchantable shipping iron ore" upon which as "iron ore mined and removed" the payment of royalty is promised, then, other considerations aside, royalty upon the crude ore could not be exacted, and the concentrates of such crude ore, if any, as the lessee had under his lease the right to take and treat, would then seem to furnish a proper basis for computing royalty.

This body of 16,021 tons of low grade ore as it lay in its natural bed

was worth the taking away. There was profit in it. The lessee could pay the 25 cents royalty and the mining, washing and carrying charges and upon sale have a margin. That is why it took it. Within the meaning of the lease, so far as concerns the provision for the payment of royalty, whatever it may be elsewhere, the washing process is not mining and the concentrates the result of mining so that there is no mined ore, or merchantable ore, until concentration. The standard and other grades of ore can be washed and the relative iron content increased. A washing plant represents a considerable investment. Its construction requires a proper physical location and the presence of proper water conditions. The washing process is a treatment of the ore. The crude ore has been won from the earth and the washing treatment refines and betters it by a mechanical process. Mining men call it the "beneficiation" of the ore. By it the iron content per ton is increased. What is mined is the low grade ore. That is what the lessee takes under the lease. It comes within the statutory term of the lease, "iron ore mined and removed," and it is iron ore for which the lessee undertakes to pay a royalty of 25 cents per ton. Within the contemplation of the lease the iron ore taken to the washing plant is the iron ore mined, and within its contemplation this is the iron ore upon which the royalty of 25 cents per ton is to be paid. The lessee claims to take it as iron ore. There is no reservation and its right is not disputed. Fortunately for the lessee the application of the washing treatment makes, just as the discovery and application of some other treatment or of an improved furnace method might make, the low grade ore profitably usable, so that it can be mined and washed and marketed at a profit; otherwise it would not take it. The state shares in the gain coming from the treatment, just as it gains from an improvement in furnace methods and transportation and mining, in this respect and to this extent, that when the call comes for its low grade ore and it is mined under a lease it gets a 25 cents royalty, but it never gets more. The lessee gets the profit, large or small, beyond this.

The defendant calls attention to the provision of the lease making the weights of the railroad transporting the ore from the mine controlling

between the parties, and it urges that since the only ore which it transports by railroad is the concentrates the weight of the concentrates fixes the basis for the computation of royalty. If the state is entitled to royalty upon the crude ore before it goes to the washing plant the lessee cannot make it otherwise by washing it on the premises and weighing only the concentrates transported by railroad. And if the defendant were to prevail in its general contention, that is, that it should pay only on concentrates, its argument now made as to the effect of the provision for weighing, if sustained, would prove its undoing as to every mine the product of which is transported by railroad off the premises for concentration. Its contention cannot prevail and we are not now concerned with an inquiry into the effect of the weighing provision as a term of the contract.

We get not much help from the cases. Counsel cite a few. They suggest for them indirect aid in the construction of the lease.

The state cites Genet v. Delaware & H. Canal Co. 136 N. Y. 593, 32 N. E. 1078, 19 L.R.A. 127; Id. 163 N. Y. 173, 57 N. E. 297; Id. 167 N. Y. 608, 60 N. E. 1111; Id. 186 N. Y. 422, 79 N. E. 437. Under the lease there involved it was held that a lessee who took inferior coal, not required to be taken, must pay royalty as upon other coal which it was required to take; that is, when the lessee took coal of any quality he took it as coal for which the royalty fixed by the lease must be paid.

The defendant cites a number of cases from Pennsylvania. They involve all sorts of arrangements for getting out coal, sometimes a sale in place, sometimes an ordinary lease, and sometimes a license. Sometimes the lessee gets all the coal by paying stipulated royalties on certain grades, in which event he gets the low grades without specific payment, and sometimes the contract is such that the title to the low grade remains in the lessor. It all depends upon the contract. The following are illustrative: Girard Trust Co. v. Delaware & H. Co. 246 Pa. St. 161, 92 Atl. 129, and cases cited; N. Y. & P. Coal Co. v. Hillsdale C. & I. Co. 225 Pa. St. 211, 74 Atl. 26; Wright v. Warrior Run Coal Co. 182 Pa. St. 514, 38 Atl. 491; Lance v. Lehigh & W. B. Coal Co. 163 Pa. St. 84, 29 Atl. 755; Dunham v. Haggerty, 110 Pa. St. 560, 1 Atl. 667.

The state cites Ellis v. Cricket Coal Co. 166 Iowa, 656, 148 N. W. 887. This case involved a lease of "merchantable and minable" coal. It discusses what is meant by "merchantable" and what is meant by "minable." It is of illustrative value in considering the term "merchantable shipping iron ore" in our state lease; but upon the general definition we do not understand the parties are in dispute and we are not interested in a minute consideration of it. The state does not claim the right to require its lessees to mine ore which cannot be mined and shipped at a profit. We do not emphasize the fact that in the case before us a profit results after the payment of the royalty, but it is a stipulated and found fact present in the case. To the Iowa case may be added Flavelle v. Red Jacket C. C. & C. Co. 82 W. Va. 295, 96 S. E. 600.

Our definite holding is that the lessee in a state mining lease who mines low grade ore, and washes it, and markets the concentrates, when the conditions are such that he can mine, wash and transport to the furnaces and sell and make a profit, after paying the state a 25 cents royalty on the crude ore mined, though he could not ship to the furnaces and wash there, if there were facilities, and have a profit, must pay the 25 cents royalty on the mined ore before washing and not on the concentrates. This is "ore mined and removed from said land," upon which the lessee promises to pay "at the rate of 25 cents per ton," and the coming into practical and profitable and common use of the treatment of the ore by the washing process, so as to make it usable, other conditions being as stated, results in making the mined ore in a practical sense and in the sense of the lease "merchantable shipping iron ore," just as much so as if the defects or impurities in the mined ore which made it not directly usable in the furnaces were obviated or removed by improved methods of furnace treatment.

Our conclusion is in accordance with practical construction. It is not uncommon for private leases to carry "washing" clauses permitting the treatment of low grade ore and providing for royalty on the basis of concentrates. The state leases do not.

The judgment is reversed with directions to amend the conclusions of law so as to require the defendant to pay a 25 cents royalty on the

143—M. 30

16,021 tons mined, credit being given for the royalty paid on the concentrates, and to enter judgment accordingly.

Judgment reversed.

On December 12, 1919, the following opinion was filed:

PER CURIAM.

On further consideration of this cause after reargument a majority of the court adhere to the former decision; Chief Justice Brown and Associate Justice Holt dissenting.

It is so ordered.

On March 5, 1920, the following opinion was filed:

DIBELL, J.

A rehearing was granted upon the question whether the construction of the mining lease made in our decision offends the contract or due process of law clauses of the Federal Constitution. We state the claims made as applied to the situation before us and the result which we reach, and engage in no extended discussion.

1. The state mining lease is in fact a lease and not a sale of ore in place. State v. Evans, 99 Minn. 220, 108 N. W. 958, 9 Ann. Cas. 520; Boeing v. Owsley, 122 Minn. 190, 142 N. W. 129; State v. Royal Mineral Assn. 132 Minn. 232, 156 N. W. 128, Ann. Cas. 1918A, 145; Orr v. Bennett, 135 Minn. 443, 161 N. W. 165; Minn. L. & T. Co. v. Douglas, 135 Minn. 413, 161 N. W. 158; State v. Cavour Mining Co., 143 Minn. 271, 173 N. W. 415.

2. In our decision it was held that a state mining lessee may, if he chooses, take from the mine and use low grade ore, rejecting by pick or shovel or other means dirt and rock and other waste material, after the manner of ordinary good mining, paying the stipulated 25 cents a ton royalty on such product, although under present furnace methods it is not usable in the furnaces in the condition in which the lessee takes it from the mine; but that the lessee is not entitled to take such product

to the washer, subject it to treatment or "beneficiation," and pay 25 cents per ton on the reduced tonnage of concentrates directly usable in the furnaces.

The defendant's contention is that our holding changes the nature of the mining lease from a lease in fact to a sale of ore in place. Such is not our view. Our holding was consistent with the theory of the state mining lease which we have maintained from the beginning. The holding that the lessee must pay the stipulated royalty upon the ore which he takes on the basis of tonnage before treatment, was not a holding that the lease is a sale of ore in place. It was an interpretation of the meaning of the lease as to the basis upon which royalty was to be paid. Our holding, stated in another way, was that the lease meant by the term "all the iron ore mined and removed," or "all iron ore so taken out, mined and carried away," upon which a 25-cents royalty was to be paid, the low grade ore which the lessee under the lease of "merchantable shipping iron ore" chose to take to the washer, and not upon the concentrates resulting from the treatment. This is not a change in the construction of the state lease. This is the only case ever before the court involving the question of the basis of payment in case of concentration and this is the first time, as we understand it, that the state's insistence upon a royalty upon the low grade ore going to the washer has been judicially attacked.

We have examined the cases cited by counsel. It may be noted that there is no legislation which the defendant claims impairs its contract. We see nothing in the claim of want of due process. We hold that our decision, to the effect that the lessee under a mining lease must pay on the tonnage of crude ore which he chooses to take to the washer and may not pay upon the reduced tonnage of concentrates, does not impair the obligation of the contract of lease nor offend the due process of law provision of the Federal Constitution. Upon this the court is agreed.

The judgment will stand reversed.