### BUCK v. CLEVELAND et al.

(Supreme Court, Appellate Division, Third Department.   March 8, 1911.)

MINES AND MINERALS (§ 56*)—CONVEYANCES AND CONTRACTS—CONSTRUCTION
OF MINING LEASE—RIGHTS ACQUIRED.

The owner of land entered into an "agreement" with one S., whereby,
in consideration of $1 and the performance of the covenants expressed,
he sold to S. "the exclusive right and privilege to prospect for, mine,
take and quarry for any and all kinds of minerals," with the right to
take away the same and to an entry upon the lands to erect necessary
buildings thereon for that purpose, for which S. agreed to pay the
owner 25 cents per ton for commercial minerals taken from the land,
the owner retaining the right to enter for breach of covenants and to
declare the contract at an end.  The agreement was to be binding on the
heirs and assigns of the parties, and subsequently the parties executed
what they called a lease, which recited the previous agreement and
provided that it was intended to grant and convey to S., his heirs and
assigns, the sole and exclusive right and privilege forever, or so long as
he should perform the covenants to mine and carry away minerals, and
later there was a further writing between the parties reciting a mining
lease and fixing a different price per ton.  The several written agree-
ments were sealed, acknowledged, and recorded in the county where the
land was situated.  *Held*, that the instruments were in effect a lease of
the land to S. to prospect for minerals creating the relation of landlord
and tenant between the parties, and giving to S. an interest which he
could sublease, and a personal estate which would pass to his adminis-
trator.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 166;
Dec. Dig. § 56.*]

Appeal from Special Term, St. Lawrence County.

Action by Chester Buck against Milo L. Cleveland and another.
Judgment for plaintiff, and defendants appeal.   Reversed, and new
trial granted.

Argued before SMITH, P. J., and KELLOGG, SEWELL, and
HOUGHTON, JJ.

Thomas Spratt, for appellants.
George A. Adams, for respondent.

HOUGHTON, J.   On the 28th day of May, 1884, one Hendrick
was the owner of 20 acres of land in which were supposed to be de-
posits of talc, soapstone, iron pyrites, and other valuable minerals,
and on that day he entered into what was termed an "agreement" in
writing with one Spaulding, whereby, in consideration of $1 and the
performance of the covenants expressed, he contracted and sold to
Spaulding "the exclusive right and privilege to prospect for, mine,
take and quarry for any and all kinds of minerals" (enumerating some
of them), with the right to take away the same, together with the
right of ingress and egress upon the land for the purpose of so pros-
pecting and mining and carrying away the material which he might
find, together with a right to build shanties or buildings upon the prop-
erty necessary in prospecting, mining, or reducing such materials to
commercial form.   Spaulding on his part agreed to pay to Hendrick
25 cents for every gross ton of commercial material which he might
take from the land, and to commence prospecting within 60 days, and

to continue and work and put upon the market all such material as he might find for which there was a paying market, and to prosecute the work in a business-like manner and keep a true account of such material and pay the 25 cents per gross ton every 30 days. It was further provided that, in the event of Spaulding failing to pay or keep his agreement, Hendrick might at his option declare the contract at an end. The final clause declared that the obligation should be binding upon the heirs and assigns of the respective parties.

Spaulding did not begin operations within the stipulated 60 days, and in November, 1898, an agreement was entered into reducing the price per ton from 25 cents to 15 cents, and providing that operations should begin within three months. Operations were not begun within his time, but in March, 1900, the parties executed a further agreement whereby the default of Spaulding was forgiven, and his rights under the "lease," as it was then called, more clearly defined. There was a recital of the making of the contract of 1884, and the following provision was made:

"Said agreements or leases were intended and should be construed and held to grant and convey to said Spaulding, his heirs and assigns, the sole and exclusive right and privilege forever, or so long as he or they shall perform all the agreements therein contained on his or their part to be performed, to prospect for, mine, dig and quarry for any and all kinds of minerals, talc, soapstone, marble, pyrites of iron or any other valuable material, and take away all of the same which he or they may discover in or on the premises therein described or referred to [all on condition that the covenants and agreements of Spaulding should be observed]."

In October, 1900, there was a further writing entered into between the parties, in which it was recited that at different times the parties had entered into divers agreements or "mining leases" relating to the mining and raising of mineral ores and foregoing all past royalties, and stipulating that Spaulding might raise and remove all ores and minerals free from any payments to the 10th day of October, 1901, thereafter to pay 15 cents per gross ton.

All these several agreements were signed by both parties, sealed, and acknowledged, and recorded in the county clerk's office of the county in which the property was situated.

On the 21st of March, 1904, Spaulding entered into "an article of agreement or lease" with one Roberts, wherein it was recited that he was the owner of several mining leases made by Hendrick to himself, and that Roberts was desirous of obtaining an interest in such leases and agreements, and therefore, for a valuable consideration, Spaulding agreed "to sublease all his interests in the above mentioned leases" to Roberts, he to pay all of Spaulding's obligations to Hendrick, and to pay to Spaulding $100 at the end of the first year in full of all royalties, and for all time thereafter 15 cents per gross ton. not less than $250, however, for the second year, and not less than $500 for the third year, and as much more as the 15 cents per gross ton might make it. Roberts was given the privilege to discontinue the lease at any time upon three months' notice upon reconveying the same and paying up all past dues, and, in case he should not keep his covenants, Spaulding had the option on 30 days' notice to cancel the lease him-

self. Roberts agreed to diligently prosecute the work of mining and developing the mines in a business-like manner, and to so continue until the termination of his lease, keeping proper accounts of the product marketed. The instrument was declared to be binding upon the heirs and assigns of the respective parties, and was duly acknowledged and recorded.

In July following Roberts sold, assigned, released, granted, and conveyed to these defendants all his right, title, and interest in and to the aforesaid leases, agreements, and conveyances from said Spaulding to himself. The defendants did not covenant or agree to perform or carry out any of the agreements and covenants which Roberts had made with Spaulding, but they did enter upon the premises and prospected and mined, and were in such possession at least until May, 1906. In September, 1904, Spaulding died intestate at Worcester, Mass., and it is claimed that one Blodget was appointed administrator of his estate, but the record contains no proof of that fact. Thereafter all the heirs at law of Spaulding and said alleged administrator, although not signing as such, joined in an instrument assigning, transferring, and setting over to this plaintiff "all the leases of mining or quarrying rights possessed by Spaulding at the time of his death," and this action was brought to recover the minimum royalties agreed to be paid by Roberts up to March 21, 1908.

The theory of the plaintiff is that Spaulding had such an interest in the land or in the minerals contained in it, severed from the surface of the soil, as passed to his heirs on his dying intestate, and that Spaulding leased to Roberts, and the defendants having taken an assignment of such lease from Roberts, and entered into possession, are bound by the covenants which Roberts made, although they made no agreement to perform them. The theory of the defendants is that Spaulding had no interest in the land or minerals which could pass to his heirs, or which amounted to anything more than an incorporeal right, giving him no right to sublease, and casting no obligation on the assignee of such lease to pay rent or perform any covenants, because he had no land with which the covenant could run.

There is great confusion in the authorities, and the right or estate which Spaulding obtained from Hendrick is very difficult to define. It seems clear to me that Hendrick did not convey to him the minerals in the ground severed from the surface of the soil. The minerals were unknown and were supposed to be of different kinds, and the various instruments do not indicate any intent to sever a block of mineral of any particular kind from the soil and separately convey it as such, notwithstanding the exclusive privilege or right to mine forever or as long as the covenants were performed.

In Pennsylvania, where the doctrine of disseverance of minerals from the land itself is carried to its fullest extent as applied to coal in place, it held that there must be a known mineral and a clear intent of the parties to make a severance, and to pass title to the mineral alone. Denniston v. Haddock, 200 Pa. 426, 50 Atl. 197. So, too, it is apparent that Spaulding obtained more than a mere incorporeal right in the land, and more than a mere license to prospect and mine. His right to prospect for, dig, and carry away the minerals was exclusive, and

existed as long as minerals could be found in paying quantities, and as long as he paid the stipulated rental or royalty. Besides, he had the right to occupy the land itself for the purpose of mining and to erect buildings thereon. Hendrick did not have the right to terminate the lease except upon breach of condition, and therefore Spaulding's tenancy was greater than at will or sufferance.

The authorities in our state throw very little light upon the question. Following the Pennsylvania decisions, the contract in Genet v. D. & H. C. Co., 122 N. Y. 505, 25 N. E. 922, was deemed by the Second Division of the Court of Appeals to be a conveyance of coal in place; but upon a further consideration of the contract (136 N. Y. 593, 32 N. E. 1078, 19 L. R. A. 127) this construction was repudiated, and it was held that the instrument was a simple executory contract for the mining of coal in a certain manner to be paid for at a certain price. It was held in Baker v. Hart, 123 N. Y. 470, 25 N. E. 948, 12 L. R. A. 60, that an instrument termed a lease, which gave to the lessee the sole and exclusive right of entering in and upon the lands of the lessor for the purpose of quarrying, cutting, crushing, and removing stone for the term of 10 years, but not to hold possession of any part of the said lands for any other purpose, gave the lessees no right of action for trespass against a stranger for quarrying stone because they had title to only such stone as they should quarry and remove within the specified term. In Moore v. Brown, 139 N. Y. 127, 34 N. E. 772, it was held that one who had the right to mine upon state lands upon paying a royalty did not have such an estate in the land as entitled him to maintain ejectment.

Petroleum oil and natural illuminating gas differ widely from other minerals in the ground. They cannot be blocked out and conveyed separately because of their wandering character. In a sense they cannot be owned until reduced to possession. In Wagner v. Mallory, 169 N. Y. 501, 62 N. E. 584, the right to produce oil which had been given in lands was held not to pass by a subsequent deed of the land itself, and such right was declared to be a personal property right. A right to prospect for gas and to bore for oil upon the land of another is much more than a right to hunt in a field or to fish in a pond. Thousands of dollars may be expended in prospecting, and the product may be worth hundreds of thousands of dollars, and it would seem that such right was entitled to some classification commensurate with its vast property interests.

Chapter 372 of the Laws of 1883 declared oil wells to be personal property for all purposes except taxation. Prior to the statute, it would appear that the courts recognized some kind of a right relating to real property in such a lease. Eaton v. A. G. Co., 122 N. Y. 416, 25 N. E. 981; Allegany Oil Co. v. Bradford Oil Co., 21 Hun, 26, affirmed, 86 N. Y. 638; Alford v. Cobb, 35 Hun, 651; Shepherd v. McCalmont Oil Co., 38 Hun, 37. In Barnsdall v. Bradford Gas Co., 225 Pa. 338, 74 Atl. 207, 26 L. R. A. (N. S.) 614, a lease for the sole purpose of mining and operating for oil, gas, and other minerals, and of laying pipe lines and building tanks on a described tract of land, was held to create a corporeal interest in the premises, and not merely a license to enter and operate for oil and gas. In Consolidated Coal

Co. v. Peers, 150 Ill. 344, 37 N. E. 937, an instrument under seal giving the so-called lessee sole and exclusive right to mine coal on certain lands was held to create an interest in land, and not a mere license. To the same effect is McDowell v. Hendrix, 67 Ind. 513. In Gaston v. Plum, 14 Conn. 344, an instrument giving a party the right to dig or mine on a specified tract of land for a specified period was held to be more than a mere license and to create an interest in the property.

In Heywood v. Fulmer, 158 Ind. 658, 32 N. E. 574, 18 L. R. A. 491, a receipt for a specified sum of money paid "for the exclusive right to all gravel and sand for the year above named and excluding all other parties from said premises," specifying the sand bar, was held to be a lease for the specified time, and not a mere license to take sand. In Indiana Natural Gas Company v. Hinton, 159 Ind. 398, 64 N. E. 224, and in Burton v. Forest Oil Company, 204 Pa. 349, 54 Atl. 266, assignees of gas and oil leases who went into possession under assignments were held to be liable without personal agreement therefor to pay the stipulated rent or royalties on the ground that the leases were such interest in the land that a covenant to pay the rent followed upon transfer and entry thereunder.

A feature of some of the above cases is that the land itself was leased for the sole purpose of prospecting, digging, extracting, and taking away whatever should be found. Such is a fair interpretation of the lease under consideration. By simply transposing its provisions, it appears plainly that Hendrick leased the entire 20-acre tract of land to Spaulding for the purpose of prospecting for and digging and carrying away such minerals as he might find. By the subsequent paper which they executed between themselves, they injected into the original contract the words "grant and convey," but this was with reference to the right to prospect only. This, however, did not amount to a conveyance of the land or of the minerals in place. By the various papers which they executed they described the original writing as a "lease." Spaulding was given the right to erect such buildings or shanties as he might see fit on any part of the 20 acres, and to pass over or dig up any part of it. Manifestly Hendrick understood he was giving, and Spaulding believed he was getting, some kind of interest in the land greater than a mere personal right to hunt for minerals therein, but not title to the land or to the minerals not severed therefrom. In effect, as I view it, Hendrick leased to Spaulding the 20 acres described for the purpose of prospecting for minerals thereon, and digging and carrying away such as he might find. It is unimportant that the right to prospect and dig is first spoken of in the instrument. The whole instrument illuminated by the subsequent writings show that he intended to lease the 20 acres for the purpose specified. This created the relation of landlord and tenant notwithstanding the fact that the rent was regulated by the number of tons of minerals which should be extracted. Gilmore v. Ontario Iron Co., 22 Hun, 391, affirmed, 86 N. Y. 455; Barry v. Smith, 1 Misc. Rep. 240, 23 N. Y. Supp. 129, affirmed, 69 Hun, 88, 23 N. Y. Supp. 261.

My conclusion is that Spaulding had such an interest in the land that he could sublease to Roberts, and that the instrument he executed

to Roberts was a lease and not a conveyance, and that the defendants by taking an assignment of such lease and going into possession bound themselves to pay the rent which he had agreed to pay as long as they remained in possession although they entered into no personal agreement so to do. But, although Spaulding held more than a license and more than an incorporeal right in the property, he did not hold an estate of inheritance which would pass to his heirs on his death. At most, it was simply a chattel real (Brown v. Beecher, 120 Pa. 590, 15 Atl. 608) and as such would go to his administrator, he having died intestate. Despard v. Churchill, 53 N. Y. 192; Real Property Law, § 33.

The plaintiff failed to prove that Blodget, who described himself as administrator in the assignment to him, had in fact been appointed as such. He therefore failed to prove his right to enforce collection against these defendants.

Recovery was had for $500 minimum rent in each of the years 1907 and 1908. The defendants claimed that the lease was terminated in 1906, and hence that in any event the recovery is for $1,000 too much. It is unnecessary to consider that question in view of the fact that the judgment must be reversed for the reason pointed out.

The judgment should be reversed, and a new trial granted, with costs to the appellant to abide the event.

SEWELL, J., concurs. SMITH, P. J., concurs in result on the ground that the liability, if any, is to the administrator of Spaulding. KELLOGG, J., concurs in result.

JOHN M. KELLOGG, J. (concurring in result). I cannot join in the prevailing opinion for the following reasons, briefly stated: Unquestionably the owner of land may sell the minerals in place below the surface, so that the purchaser owns the same as real estate. Such divided ownership in land may be created by deed or by reservation, the grantor reserving the minerals while conveying the remaining property. It seems to me that no more effective lnaguage can be used to convey the minerals in place than a grant to another, his heirs and assigns forever, of the exclusive right to mine and remove them. Stockbridge Iron Co. v. Hudson Iron Co., 107 Mass. 290; Reeves on Real Property, § 230.

Hendrick conveyed the minerals in place to Spaulding for $1, with the agreement of the purchaser to remove them and pay 15 cents per ton for the same when removed. This 15 cents per ton, the so-called royalty, was not rent for the use of real estate. There was no relation of landlord and tenant, but rather that of vendor and vendee of minerals, and the royalty was a part payment of the purchase price, to be made when the minerals were removed. The right to enter upon the premises is merely incidental to the right to mine. It was entirely unnecessary to insert that provision in the agreement, and the construction of the agreement in other respects cannot be affected by that immaterial provision, because the right to mine carried with it the right to enter upon the premises and make proper excavations and build proper structures for the necessary purposes of mining. Marvin v. Brewster Iron Mining Co., 55 N. Y. 538, 14 Am. Rep. 322.

The subsequent agreement, giving to Spaulding the right to dam the creek for mining purposes, was not a lease of any part of the real estate, but was a sale of that right for $1, and in no event did the agreement contemplate the payment of any other consideration therefor. Hendrick was undoubtedly induced to permit the damming of the creek in order to encourage the removal of minerals, and thereby hasten the payments which he was to receive for what he had sold. That agreement did not change the prior relations of the parties.

By the agreement with Roberts, Spaulding simply assigned his rights under the Hendrick grant, with the provision that, in addition to the payment of 15 cents to Hendrick, he was to receive also 15 cents for each ton of mineral when removed. Spaulding had held the Hendrick contract since 1884, and Hendrick had realized only the original dollar from it. In order to hasten the removal of the minerals, Spaulding provided a guaranteed minimum royalty, which, if he did not receive, he might terminate the rights of Roberts under the agreement.

I think it is evident that Spaulding could convey no different rights to Roberts than he had received from Hendrick, and that the conveyance was intended to be of the same quality and interest. Roberts was not therefore a tenant or Spaulding a landlord, and there was no rent reserved for the use of real estate. The moneys to be paid were simply a part of the purchase price of the minerals, which to Hendrick was only payable as the ore was removed, but which to Spaulding was to be payable partly in advance if ore was not removed which would earn the agreed payment.

By a rule of law applicable to landlord and tenant, an agreement to pay rent for the use of real estate runs with the land so that an assignee of the lease in possession of the land leased is personally charged with the payment of the rent, although he has not otherwise agreed to pay the same. The rule has no relation to contracts between vendor and vendee, or other relations as to the sale or ownership or use of real or personal property. The defendants, by failure to keep Roberts' agreement, would necessarily lose the benefits arising from it, but they did not subject themselves to personal liability. They could not remove ore from the premises without payment therefor. Substantially no ore has ever been removed, and, while we find a clause in the second agreement with Hendrick giving the option for six months to purchase the entire real estate for $1,500, which indicates that the parties considered they were contracting merely with reference to remote possibilities, we find a judgment here against the defendants for $1,487.21 for the alleged use and occupation of said premises for less than four years, when nothing has been realized from them, the owner having had the entire use of them, while the other parties to the agreement have simply been prospecting, hoping to find the minerals and willing to pay the purchase price for any so found. I favor a reversal of the judgment upon the law and the facts.